Argued September 17; affirmed November 10; rehearing denied
December 8, 1942

## EGR *v.* EGR ET AL.
(131 P. (2d) 198)

[ 1 ]

Before Kelly, Chief Justice, and Belt, Bailey, Rand, Rossman and Brand, Associate Justices.

*Gordon A. Ramstead*, of Eugene (William Huey and Howard M. Brownell, both of Eugene, on the brief), for appellant.

*Chris J. Kowitz*, of Salem, for respondent.

ROSSMAN, J. This matter is before us upon appeals taken by John Joseph Egr from two decrees entered against him in the circuit court. Both appeals present the same issue. One of the decrees was entered in a suit which he, John Joseph Egr, as alleged trustee, instituted against his mother, Mary Egr. In her answer, the mother alleged that her signature to the trust instrument, which the son, as plaintiff, sought to enforce, was procured through fraud. In the other suit the mother was plaintiff and this appellant was defendant. The complaint in that suit attacked, on charges of fraud, the trust instrument and prayed that it be cancelled. In both suits the circuit court sus-

tained the charges and cancelled the instrument. For the purpose of this appeal both causes have been combined.

The pleadings in the two suits developed as the sole issue the validity of the aforementioned trust agreement and two deeds which were signed concurrently with it. All three were executed October 5, 1940, by Mary Egr and her husband, John Egr, who died October 18, 1940. The alleged trust agreement designated the son as trustee to hold and manage the two items of real property described in the deeds. Those properties were owned at the time of the execution of the instruments by John and Mary Egr in the form of an estate by the entirety. One was a farm, worth approximately $6,000, and the other was a dwelling house and lot in the town of Scio, worth about $1,500. In October of 1940 the mother was 74 years of age, the father, who was then afflicted with an incurable malady, was 77, and the appellant, who was their eldest son, was 53 years of age. The two items of real property, together with a small amount of personal property, constituted the entire estate of the husband and wife, who lived upon the farm.

The trust agreement provided that the appellant should hold the two properties for the use of his parents during their joint lives, that upon his father's death the appellant should sell the farm, and that his mother should then occupy the Scio property. The instrument directed that out of the balance "the trustee is to apply such funds in his possession for the use and benefit of Mary Egr, wife of John Egr, donor, as in the discretion of the trustee she may require". The instrument empowered the appellant, upon the death of his mother, to sell the Scio property, pay her debts and then distribute the remainder among

six individuals named in the instrument. Four of the six were the children of the donors; the other two were their grandchildren. Among the six was the appellant. He and two of the others were each given one-fourth of the estate; the other one-fourth was divided among the remaining three. The agreement provided that out of the trust estate the appellant should "pay all of the necessary costs and expenses of this trust including * * * the reasonable compensation of the trustee". It directed him to "appoint as attorney for this trust, Gordon A. Ramstead of Eugene, Oregon, and that as such attorney he shall be paid for all the necessary business of the administration of this trust in the same manner as if he were appointed for our estate by wills". Mr. Ramstead is the stepson of the appellant. Continuing, the instrument said that if the appellant "cannot act as trustee, then his son, Donald John Egr, may be substituted to act as trustee. No bond to be required of trustee." The instrument reserved to the donors no power of revocation and was plainly written under a belief that the husband would predecease his wife. It did not state what should be done if the anticipated death did not occur. The other two papers were deeds. One conveyed to the appellant title to the farm, and the other title to the Scio property. In neither instance was the grantee's name succeeded by the term "trustee"; nor did either deed mention the trust agreement.

In the suit in which the mother is the plaintiff the three conveyances are attacked upon charges of fraud, and the prayer asked that they be cancelled. The complaint avers that no consideration whatever was received for them. It alleges that when the papers were signed the appellant had great influence over his mother and knew that his father was suffering from

a malady which would shortly take his life. It further avers that the appellant knew that the aforementioned properties were owned by his parents as tenants by the entirety, and that, since the father's demise was near at hand, the appellant knew that the mother would shortly come into sole ownership of the properties without resort to probate proceedings. According to the complaint, the appellant induced his parents to sign the papers by concealing their true nature, by falsely leading his mother to believe that one of the papers was a will and that, through the execution of the papers, several hundred dollars of probate expenses would be avoided. The complaint charges that the son also concealed from his mother the fact that by signing the papers she would part with the ownership and control of the two properties. The answer of the appellant denies all charges of fraud.

In the suit in which the appellant is plaintiff he sought authority from the court to sell the farm property for the sum of $5,500, less a mortgage indebtedness against it of $1,200. And, by averring that "$25.00 per month is a reasonable and sufficient amount to allow her (his mother) at the present time for her needs," he sought an order authorizing him to pay his mother out of the trust estate $25.00 per month. The answer filed by the mother attacked the trust instrument upon charges of fraud similar to those which we have already mentioned.

Seemingly, due to the fact that the alleged trust instrument made as beneficiaries, after the parents' death, the appellant, the other three children of the donors, and their two grandchildren, the latter five were made parties-defendant in each suit. None of them filed an answer, and hence we are not concerned with any of them.

We see from the foregoing that the challenged trust agreement gives to the appellant one-fourth of the residue of the estate at the time of the plaintiff's death. Further, that instrument appoints the appellant trustee, directs that his charges be paid from the trust estate, appoints his stepson legal advisor to the estate, directs that the stepson be paid upon the same basis as if the estate were probated, and, finally, provides that the appellant's son should be appointed trustee in the event the appellant was unable to act in that capacity. The donors received no consideration for their execution of the instruments.

██ The plaintiff claims that a confidential relationship existed between herself and the appellant and that she, therefore, had a right to rely upon him when he presented the aforementioned papers for her signature. She also claims that he abused that relationship.

Section 497, Restatement of the Law, Contracts, says:

"Where one party is under the domination of another, or by virtue of the relation between them is justified in assuming that the other party will not act in a manner inconsistent with his welfare, a transaction induced by unfair persuasion of the latter, is induced by undue influence and is voidable."

In the Comment which follows the above statement it is said:

"The relationships that ordinarily fall within the rule are those of parent and child, guardian and ward, * * *. In each of these cases, however, it is a question of fact whether the relationship in a particular case is such as to give one party dominance over the other, or put him in a position

where words of persuasion have undue weight;
* * *

"c. The degree of persuasion that is unfair depends on a variety of circumstances. The ultimate question is not merely whether the persuasion induced the transaction, for such persuasion is often permissible, but whether the result was produced on the one hand by influencing a freely exercised and competent judgment or on the other by dominating the mind or emotions. The weakness or dependence of the person persuaded is a strong circumstance tending to show persuasion may have been unfair."

■ From Bogert, Trusts and Trustees, § 482, we quote:

"Equity will never bind itself by any hard and fast definition of the phrase 'confidential relation'. It will not list all the necessary elements of such a position. * * * In declaring a relation technically 'confidential' the courts lay stress on various factors. There is always, of course, the actual placing of trust and confidence on at least one occasion, and often such reliance has been exhibited through a series of months or years."

■ This court has many times applied those principles of law. In as early a report as 7 Oregon this court said:

"The law seems to be well settled that when one accepts a confidential or fiduciary relation to another, as that of guardian and ward, attorney and client, and the like, where the donee or grantee is supposed to exercise an unusual and commanding influence over the grantor, courts will set aside the conveyance unless the grantee can show that the transaction was fair, and without fraud or undue influence." *Gilmore v. Burch,* 7 Or. 374, 33 Am. Rep. 710.

A recent instance of the application of that principle is found in *In re Brown's Estate*, 165 Or. 575, 108 P. (2d) 775. See also 24 Am. Jur., Fraud and Deceit, § 258, p. 90.

■ When a settlor claims that he was induced by fraud to create a trust, a proper subject of inquiry always is whether a confidential relationship existed between him and the beneficiary, and whether the latter improperly persuaded him to create the trust. See Restatement of the Law, Trusts, p. 1008, Comment, subd. c.

We shall now ascertain whether a confidential relationship existed between the appellant and his parents at the time the transaction under review occurred. Our purpose will be to determine whether the parents were justified in assuming that their son would not act in a manner inconsistent with their welfare and whether his words at that time were bound to be peculiarly persuasive with them.

About a year before his death the father was overtaken with illness, and in August 1940 consulted some specialists in Portland. From them he learned that he was afflicted with an incurable malady and that he could not expect to live longer than a few weeks more. The nature of his illness is not disclosed by the record, but the evidence indicates that it was a painful one. Opiates were administered to him at times in sufficient quantities to cause his mind to wander.

The parents had lived on the farm in question, or near to it, for 30 years. The mother, to whom we may refer as the plaintiff, had no business experience and was unfamiliar with legal papers. However, she was industrious and over extended periods of time, while her husband worked for others, operated the farm alone. Some years previously she had herself attended

to the sale of a farm, and hence had displayed ability to handle practical matters. Plainly, a high degree of affection prevailed between husband and wife. After the father realized that he was afflicted with an incurable illness he frequently expressed concern over his wife's welfare and said that upon his death he wanted her to have all the property they had accumulated. Undoubtedly his concern for his wife's welfare was the reason why title to both properties was taken in the joint name of husband and wife. In turn, the plaintiff was concerned with her husband's illness. In the last months of his life she gave her undivided attention to him and her efforts to relieve his suffering occupied all of her time. The appellant described the plaintiff as "a wonderful mother".

As we have seen, the estate of these two humble people consisted of two items of real property worth about $7,500 and some personal property of modest value. The farm was encumbered to the extent of $1,200. At the time of the father's death the total indebtedness of the two, including the mortgage and medical and funeral expenses, was $2,000. The realty, as already indicated, was held by husband and wife as an estate by the entirety. Due to that circumstance, the plaintiff, so she testified, "knew we didn't need no last will. We were both on the papers, and we didn't need no last will."

Mr. Gordon Ramstead, the attorney who is mentioned in the trust agreement, is the stepson of the appellant and is the latter's attorney in these two suits. He was one of his witnesses in the trial court and as such described the confidence which the parents reposed in the appellant. For instance, he said: "He was the one that they relied on the most and he helped them make the payments on the farm, and he was the

one who always helped them when they needed help." The appellant testified: "I think Dad, in making out the trust agreement, had a lot of confidence in me." He added that his mother's confidence in him was in similar measure. The appellant lived in Oregon City, 65 miles from the home of his parents, whom he visited six or eight times a year up to the time of his father's illness. After the latter became serious the visits were more frequent. When his father was undergoing a medical examination in Portland he stayed in the appellant's home. We mention these circumstances for the purpose of indicating that the relationship between the appellant and his parents was cordial, at least in the period preceding the transaction under attack, and that they had confidence in his good intentions. We now pass on to questions which we deem more material; that is, the precise relationship between the appellant and his parents at the time of the transaction under review, and whether appellant took the initiative in the preparation of the three documents previously described.

As we have already indicated, the two items of property which this couple had accumulated as a result of a lifetime of toil and frugality were owned by them in such a way that the survivor would take all without recourse to probate proceedings. That arrangement caused them to have no interest in wills. The plaintiff at least was satisfied with the property arrangement and, so far as the record indicates, her husband never mentioned the writing of a will until shortly after he returned from his visit to the appellant's home. At that time, according to the testimony of A. K. Lewis, a son-in-law of the Egrs, Sr., appellant's wife inquired of him: "What do you think about Dad Egr making a will?" Lewis replied that he had no interest in that

matter, but the appellant's wife continued the conversation by saying: "I have been talking to him about making out a will and I want to know what you think about it." Two or three days later, according to Lewis, the father said to him: "Mrs. Egr and them folks, they keep asking me all the time to make out a will." By "Mrs. Egr" the father meant his daughter-in-law. None of this testimony was contradicted.

After the plaintiff's attention had been directed to an incident which happened September 8, 1940, she was asked: "Was that the first time you and your husband talked about making a will?" She answered: "No, they talked before; my daughter-in-law insisted on my husband making a will for a long time. We didn't need any last will, but when she insisted, my husband thought he would make a last will." In using the term "daughter-in-law" the plaintiff referred to the appellant's wife. According to the plaintiff, her daughter-in-law mentioned to her and her husband more than once the matter of a will. Referring to her daughter-in-law, she said: "She was the one that started the last will." None of this testimony was contradicted; in fact, the daughter-in-law did not testify.

When the appellant was on the witness stand he was asked whether he suggested the writing of a will to his father. He replied: "I don't know just how it came about; I couldn't say. Probably I did mention it to him, for all I know. People should make out their wills and take care of their —" At that point he was interrupted, but shortly resumed: "No, I don't recall that I mentioned it to him, but I might have; it is possible because I have my papers all taken care of."

The above testimony convinces us that the appellant prompted his parents to plan a testamentary disposition of their property in lieu of the one they had. We

shall now undertake to determine whether the appellant influenced his parents in the preparation of the instruments under review.

Gordon Ramstead, the appellant's stepson, prepared all of the papers under attack. The appellant concedes that he is the one who told Mr. Ramstead to call upon his parents, and admits that he gave this direction shortly after his father returned from the Portland visit. The appellant swore that his father asked him to make the request just mentioned. His exact words were: "Soon after we made the trip to Portland and returned, we were at the ranch again and Father expressed a desire to have Mr. Ramstead come down and fix up some legal papers." Mr. Ramstead testified: "My stepfather, John Egr, wrote to me at Eugene—it was in the latter part of August or the first part of September of last year, asking me if I wouldn't come to the farm and help Dad and Mother make out some papers." It will be observed that both the appellant and Mr. Ramstead used the term "papers". It is manifest that Mr. Ramstead knew the nature of the "legal papers" which were desired because he took with him when he went to the farm a form book of wills and a typewriter. He made this visit on Sunday, September 8, 1940. The letter which Mr. Ramstead mentioned was not produced. It will be noticed from the above that the appellant said his father told him to send for Mr. Ramstead. The plaintiff, referring to Mr. Ramstead, and in answer to one of his questions, said: "Well, your mother asked him (Egr, Sr.) if he wanted you to come to the place so he could sign it." That testimony was not contradicted, and, of course, indicates that the appellant and his wife induced Mr. Egr, Sr. to accept Mr. Ramstead as attorney for the drafting of a will and send for him. At

any rate, the appellant sent Mr. Ramstead to the Egrs, Sr., and we will now state what then occurred.

September 8, 1940, Mr. Ramstead called upon the Egrs. Those present, in addition to himself and the parents, were Mr. Ramstead's wife, the appellant and his wife and the aforementioned A. K. Lewis. After the plaintiff had served dinner to the group the parents and Mr. Ramstead retired to another room. The attorney testified that at that point the father explained that he would like to have a will prepared and that it was evident that "primarily he wanted his wife taken care of. He wanted to be sure to have her taken care of." It is clear, not only from those words, but from the unchallenged testimony of several other witnesses, that the father's concern was for his wife's welfare. Mr. Ramstead swore that Egr, Sr., was a sick man and that after he had expressed the wishes just indicated he lay down upon a bed in order to get relief. At that juncture the attorney began to type a will, but shortly inquired concerning the nature of the title to the properties which the Egrs possessed. Upon discovering that the ownership was in the form of an estate by the entirety Mr. Ramstead advised his clients that it was unnecessary to write a will. He told them, however, that it would be advisable for them to execute a trust agreement in order that the plaintiff would have the full benefit of the property. That ended interest in a will, and at that point the document now under review had its inception. Mr. Ramstead explained the circumstances thus: "Mrs. Egr never had any particular business experience, and they felt—Mr. Egr felt that everything possible should be done to protect her interests. * * * He (the father) was also of the opinion that maybe some of the younger children might come in and help his wife use up some of the money

that was left." Mr. Ramstead testified that he explained to the Egrs the manner in which a trust would operate and that it was then agreed that the appellant should be the trustee. He claimed that in the course of the conference he blocked out roughly the principal features of a suitable trust agreement. According to his testimony, the appellant returned to the room while the parties were discussing the trust disposition of the property and heard the discussion.

The appellant concedes that during the course of the conference of September 8 he was "probably in and out" of the room in which the conference was taking place. Although he claimed "I didn't listen in" upon the discussion, he admitted, "After the arrangements were made the fact was mentioned that I was asked to be trustee  *  *  *. It was understood I was to be the trustee." He claimed that Mr. Ramstead "went to a great deal of trouble to explain the whole matter," that is, about the trust. Although he swore, "I didn't listen in" nevertheless he testified with positiveness that his parents fully understood that title was to be conveyed to him (the appellant) and that he was to have control over the property. His exact words are: "I think it should have been thoroughly understood." He explained the reason for the contemplated conveyance to himself and of the trust instrument by saying: "The whole purpose of the trust agreement was to save Mother a whole lot of expense."

As we have already indicated, the trust agreement was not prepared on September 8. On that day the plan for a will was abandoned and as Mr. Ramstead said, "I couldn't draw the papers up at that time (September 8) because I didn't have the deeds or the description to the property". At that juncture Mr. Ramstead and his family returned to their home.

A few days after September 8 the deeds were mailed to Mr. Ramstead and shortly he prepared the trust agreement and its two accompanying deeds. They are the instruments under attack. He mailed these papers, not to the Egrs, but to the appellant. His reason for not mailing the papers to his clients (if he deemed the parents as his clients) follows: "For the simple reason that papers of that kind have to be properly executed and explained   *   *   *. I thought he could explain them to the folks."

The attorney's statement that the trust agreement needed explanation was, of course, well founded. Let us now see whether it was explained to the parents before they signed it.

The appellant received the three papers Saturday, October 5. When Ramstead sent the papers to him he accompanied them with a letter in which he said: "You have Dad and Mother sign the deeds to you before a Notary Public,   *   *   *. You keep both copies of the trust agreement, and bring the deeds to me   *   *   *." The appellant testified that October 5, about 2 o'clock, he started for his parents' home, taking the papers with him. He explained: "I don't like to ride alone on a trip like that so I invited Mr. Loder to go with me." Loder accepted the invitation. That was the explanation given by the appellant upon direct examination for the presence of Loder on this trip. Mr. Loder, whose full name is John W. Loder, is an attorney and notary public with an office in Oregon City. It will be observed that the appellant indicated that he chose Mr. Loder merely as a traveling companion and that his choice was purely casual; nevertheless Ramstead's letter of instruction from which we have quoted told him: "Have Dad and Mother sign the deeds to you before a Notary Public, and have the notary witness their signa-

tures on the trust agreement.'' When his attention was called to these instructions, the appellant said: ''It wasn't a premeditated journey, and not premeditated that I take Mr. Loder along.'' We observe that Mr. Loder took with him his notarial seal.

The appellant and Mr. Loder arrived at the farm about 4:30 or 5:00 o'clock. Mr. Loder had never been there before, did not know the appellant's parents, and did not know what, if any, property they possessed nor how they held it. He became a witness for the appellant, and testified: ''We finally came to the home of his father and on the way he said he had some papers he would like to have me notarize when we got there. He introduced me to Mr. and Mrs. Egr and I think he told them he had the papers with him to be signed, and that I would act as notary. I think from then on I took the papers and asked Mr. Egr, Sr. about them. He seemed to know. Of course, you understand, at this time I didn't know what the papers were about. I hadn't even looked at them.'' It is material to take note of the words last quoted: ''Of course, you understand, at this time I didn't know what the papers were about. I hadn't even looked at them.'' When Mr. Loder took a look at the papers he thought that a subscribing witness, in addition to himself, was needed and thereupon the appellant went in search for a man in the field, who, it developed, was the aforementioned A. K. Lewis. We now quote further from Loder's testimony. He is relating what happened in the room where he and the parents were seated while the appellant was in search for Lewis. He said: ''While he was gone, we sat at the dining table. Mrs. Egr was there. It never occurred to me they were papers I needed to explain, but it has been my custom when I ask a person to sign his name I ask him if he knows what it is, and I said to Mr. Egr,

Sr.: 'I suppose you know what this is, and it is something Mr. Ramstead prepared' and he seemed to be familiar with it.'' Continuing his explanation, he said: ''While John was gone, we visited most of the time. We didn't talk about this very much because I didn't think it was necessary.'' In this interval Mr. Egr, Sr., inquired whether he could borrow money if he signed the papers, and thereupon Mr. Loder looked over the trust agreement and replied: ''That means to me the trustee is holding that property for these people for the joint use of the donors, and anything those people need to have done, this trustee would have to join with them in doing it.'' He was asked: ''Did you read the entire instrument to these folks?'' and replied: ''I didn't read it line by line. It never occurred to me there was any question of them not understanding it.'' Loder more than once, in referring to the papers that were signed and the Egrs' frame of mind, said: ''It never occurred to me there was any question about it.'' That being true, he volunteered neither advice nor information. The following is also quoted from his testimony:

''Q. I believe you stated you never read the trust agreement?

''A. Not all, no.

''Q. Did you know the property was held as tenants by the entirety?

''A. No.

''Q. So you didn't know what effect the agreement would have?

''A. No.

''Q. So you couldn't explain to them, what the effect would be in that way?

''A. No, not the legal effect.

''Q. I think you said you didn't know the legal effect of the trust agreement at that time?

''A. I didn't inform myself about the legal effect. I wasn't acting as attorney.''

Seemingly, Mr. Loder made no explanation concerning the meaning of the trust agreement, apart from the one which we quoted a moment ago. The Egrs were strangers to him and he was unfamiliar with their affairs and knew nothing of the purpose of these documents. Since he was not there as the attorney for anyone, he neither volunteered any information nor sought to obtain sufficient knowledge as the basis for advice had it been requested. In other words, the Egrs, received from him scant information concerning the papers which they signed. It is not claimed that the Egrs read the trust agreement or its two accompanying deeds. Let us now see whether the appellant acquainted his parents with the contents of these three papers. It is not claimed that Mr. Ramstead communicated with the Egrs, Sr., after he left their home on September 8.

It must be remembered that the Egrs, Sr., up to October 5, had not seen the papers which they on that day signed. The appellant swore that when he entered his parents' home, ''I told Mother and Dad I had brought the papers; that I had received them from Mr. Ramstead, and I had brought them to be signed.'' We pause to observe that that was a remarkable greeting from him for his parents. So far the latter had not yet seen those papers and yet they were now met with the declaration, ''I brought them to be signed.'' Referring to the trust agreement, he swore, ''I don't know whether I read it before I took it down there or not.'' He didn't claim that he read any of the papers while he was in his parents' home; in fact, he indicated quite clearly the opposite. If his testimony is true, he did not ask his traveling companion (Mr. Loder) while they were riding to the farm to read or explain the papers, yet the trust agreement imposed duties upon this appellant. Although trust agreements generally exact of

the trustee a bond, signed by sureties, the appellant, if his testimony is believed, didn't even peek into the papers to find out whether he would be required to furnish a bond and, if so, in what denomination. Notwithstanding all of this, he signed the trust agreement concurrently with his parents. Of course, the appellant must have read the trust agreement before he signed it, and undoubtedly he did so in his own home before he started for his parents' place. This detail of the transaction under review is important, for when we seek to ascertain the credibility of a witness we are sometimes compelled to grasp at straws. Straws, however, not infrequently tell the direction in which the wind is blowing.

Bearing in mind Mr. Loder's testimony that he was not familiar with the affairs of the Egrs nor with the contents of the trust agreement, and had not informed himself "about the legal effect" of that document, we now read the appellant's version of what took place when the papers were laid before his parents for their signatures. He said: "Well, Mr. Loder was kind enough to sit down at the table with us, and he started—of course, Dad questioned Mr. Loder, and Mr. Loder explained the whole thing, and I didn't pay much attention to what they were talking about." Further, he testified: "I recall hearing him explain, but I don't recall the words." Again we quote from his testimony:

"Q. About how long did Mr. Loder take to explain these instruments to your parents?

"A. We were at the farm two hours before we left, and most of that time was taken up by those legal papers. * * *

"Q. How do you know she (the plaintiff) ever understood that agreement; you say you never heard it explained to her and you say you never discussed it with her?

"A. No, Mr. Loder being of a legal mind was very capable of explaining it to her.

"Q. You are sure she understood it?

"A. Yes, absolutely, because I am sure he explained it to her."

It will be observed that the appellant's statement, "Mr. Loder explained the whole thing  *  *  *  I am sure he explained it to her" is directly contrary to Mr. Loder's testimony. Mr. Loder, although a friend of the appellant, is disinterested. Further, the appellant's testimony, "Dad questioned Mr. Loder, and Mr. Loder explained the whole thing" is confronted with the fact that Mr. Egr, Sr., was an old man, afflicted with a painful illness, from whom life had ebbed away to such an extent that he had no strength for questioning an attorney in search of the legal effect of a document. His tired old body sought the relief afforded by his bed and his mind was occupied with the affairs of his soul. Thirteen days later he was claimed by his Maker. We are satisfied that he did no questioning. We believe Mr. Loder, and think that the appellant's testimony concerning this episode severely discredits him.

Notwithstanding the statement just made, we are going to believe the appellant when he swore that he gave his parents no explanation concerning the contents of the papers. It is not claimed that Egr, Sr. read these papers and no one testified that the plaintiff read them. It is, therefore, apparent that these elderly people had no adequate information concerning the contents of the papers which they signed.

The appellant freely concedes that he advised his parents to sign these three papers. We quote from his testimony: "I told Mother when Mr. Loder was talking to her, I thought it would be a good thing for

Mother to sign the papers. I did mention that once or twice during that conversation while I was in the room.'' And yet he had testified only a few minutes previously, ''I don't know whether I read it before I took it down or not.'' It is not pertinent to revert to Scott's lines: ''Oh, what a tangled web we weave, when first we practice to deceive.''

We shall shortly revert to the appellant's testimony, but, in the meantime, we will consider briefly the explanation made by the plaintiff about the signing of the documents. As a witness, she stated repeatedly that she thought that a will was typed by Mr. Ramstead on September 8; she also said that the attorney ''read part of it—how the property would be sold and divided between the four children'' after the parents' death. She approved that provision. Then Mr. Ramstead, according to her testimony, folded up the papers and shortly concluded the visit. She thought that the will would be presented on a later day for signature. She swore that between September 8 and October 5 she and her husband did not discuss the will. Her explanation was: ''He was so ill, he wasn't, you know, able. All I had on my mind was his sickness. He was so bad off already.'' She also swore that in the interval she did not discuss the paper with her other three children.

The plaintiff testified that she assumed that the paper which the appellant brought for the parents' signatures on October 5 was the will that Mr. Ramstead had typed September 8. Mr. Loder, who accompanied her son, she described as a stranger. We now quote from her testimony: ''John asked his Dad to sign the papers, you know, and of course this Mr. Loder done something, but I was mostly in the kitchen; I thought they would stay to supper. I was going to make supper for

them, and I didn't hear much what they were talking about." Referring to her son and the papers which he brought, she said: "I understood it was the last will. That is what I had in mind, and that is what I signed; I signed the last will." She swore, like the other witnesses had, that she did not read the paper. Throughout her testimony the plaintiff constantly declared that she did not want to give up control over her two pieces of property. That attitude upon her part is, of course, understandable. A parent who surrenders his property to his children frequently loses both his property and the affection of the children. Moreover, this woman, referring to these two modest pieces of property, said: "I worked and saved all my life." Therefore, it is not difficult to understand why she did not want to part with control over the fruits of her labor. We now quote from her testimony: "I asked him (the appellant) and he said we would have the say-so about the property just like before after they were signed; that we will have the say-so about the property until our death, you know, just like before. With that understanding, I signed the papers.  *  *  *  I asked John, and he said, 'Mother, you will have the say-so just like before,' so I took his word for it.  *  *  *  He said we would have the say-so until our death and I was satisfied; I didn't need anything after I died." To the question, "Did you know when you signed those papers that you couldn't yourself sell the farm any more?" she replied, "No, I thought I had the say-so about it."

The plaintiff testified positively that when she signed the papers she had no idea that she was thereby surrendering control over the properties. She was also asked: "When you signed those papers whose word did you take for it that they were all right?" Here is

her reply: "My son's word. I had faith in him." We quote again from her testimony:

"Q. In discussing this matter over with your son John what did he say the papers were?

"A. Well, he said it was the last will. That is what was talked about; it was nothing else but the last will, and with that understanding, of course, I signed them. I thought it was the last will."

When the papers were signed Mr. Egr, Sr., according to the plaintiff, "was awfully ill. * * * All I had on my mind was his sickness." It was the last day he was out of bed. We quote again from the plaintiff's testimony—she was referring to the appellant and the papers which he presented for signature: "I said to him, 'Son,' I said, 'Son, why not leave the papers here, and we will look them over and sign them and send them to you.' 'No,' he said, 'I got to bring these papers back with me.'" The appellant, when asked concerning the same incident, testified:

"Q. Didn't she say something about that she would like for you to leave these papers there so they could look them over?

"A. I did leave one of them.

"Q I mean before they signed?

"A. I don't recall."

It will be observed that the appellant did not answer the question when it was first submitted to him, but said, "I did leave one of them." The paper, or rather the two papers, which he left were the deeds whereby the Egrs had acquired title to this property. Those deeds had been forwarded to Mr. Ramstead after the conference of September 8. When the latter sent to the appellant the trust instrument and its two accompanying deeds he included the two old deeds so that the

appellant could return them to his parents. Seemingly, it was those old deeds to which the appellant referred when he said, "I did leave one of them."

The appellant and Mr. Loder did not stay for the supper which the plaintiff prepared, but returned to Oregon City immediately after the plaintiff and her husband had signed the three papers. Although the trust agreement was written and signed in duplicate, neither the original nor the duplicate were left with the Egrs. The appellant took both of them, together with the two deeds, home with him. The plaintiff thought that the visit lasted for less than half an hour.

It will be remembered that after Mr. Loder and the appellant entered the house the appellant went in search of an additional witness at Mr. Loder's request and found Mr. Lewis, one of the sons-in-law of the Egrs. Mr. Lewis testified that when he reached the room where Mr. Loder and the Egrs were seated the papers had already been signed. He swore that some time afterwards, "Mr. Egr sat there and cried for half an hour and told me he thought he had done a wrong thing.  *  *  *  He didn't seem to comprehend what he had done." On two or three occasions afterwards, according to Lewis, Egr, Sr. "was worried, he was grieving, he didn't know what he had done exactly, and that was on his mind."

Mrs. Joe Oswald, a sister of the plaintiff, testified that September 11, 1940, while she was visiting in the Egr home, Mr. Egr, Sr. "was telling my daughter and I he had a will made and he said he willed after his death everything was to go to Mother—he called her Mother—and after Mother was gone, everything was to be divided in equal shares, except half of Ed's share should go to his children."

Ed Stpanek, a farmer who lives near the Egr place, testified that in the latter part of September, 1940, Egr, Sr., "told me about his will, that he already had it started, and he told me everything going to be for Mrs. Egr. He said, 'I am going to take care of Mother, and when she is through with it, it will be divided amongst the children equally.' He was a great man to talk, and it was on his mind * * * he was awfully sick * * * he called it a will."

R. R. Borovicka, a son-in-law of the Egrs, as a witness for the appellant, described in the following words a visit with Egr, Sr., which he said he had on some day after October 5, 1940:

"There wasn't very much said; I didn't stay very long. The only thing that was said, I asked him if he fixed up some papers, like you usually do, and he said that everything was fixed up. I didn't ask him much, and he went on voluntarily and seemed to be satisfied, whatever it was. He seemed to be satisfied, and I didn't question him who and what."

In response to a further question, he added:

"I didn't stay very long, and so there wasn't anything particularly said, except he was satisfied and Mother would be taken care of. He said, 'I just gave it to the kids and they can have it if they take care of me.' That is the words he said to me. It wasn't said in a sad tone, I don't know why he said it at that time. Well, that was after this agreement was signed. * * *

"Q. You say you knew nothing about the trust agreement until after the funeral?

"A. No.

"Q. Didn't you say you talked with your father about it before he died?

"A. That is perfectly clear. He didn't tell me what was in it. I didn't know whether it was a trust agreement or a will."

In the following testimony he described what took place when the trust agreement was read after the funeral service:

> "There was a bunch of friction as I had expected it to be. I didn't say anything one way or the other because I figured I wasn't concerned, but I could see there was friction there."

Borovicka is the individual who wishes to buy the farm property from the appellant as trustee at a price of $5,500. At any rate, his offer of that sum caused the appellant to institute one of the two suits under review. The plaintiff swore that she can readily obtain $6,000 for the property, and that she has an offer in that amount.

The foregoing suffices as a review of the evidence. We have omitted, for reasons which will later appear, a review of the testimony concerning the alleged fraudulent representations. We pause to observe that, in spite of the appellant's many negations and evasions, undisputed facts severely discredit him. As was said of another, "The more he tries to conceal himself, the more clearly will his character appear in spite of him." Upon the other hand, the plaintiff's truthfulness is unchallenged. In fact, Mr. Ramstead, in his opening statement in the circuit court, said: "He (the deceased husband) realized his wife was a woman of fine character."

The testimony of Mr. Oswald and of Mr. Stpanek just reviewed indicates that Mr. Egr, Sr., like the plaintiff, thought that a will was written in September. The testimony of Mr. Borovicka is not adverse to that of these two witnesses, and indicates that the deceased did not realize that the paper which he signed was a trust agreement; certainly it shows that he did not know that he had parted irrevocably with his property.

After the funeral service the Egr family had a meeting, in the course of which Mr. Ramstead read the trust agreement. Concerning that incident, he was asked: ''Was there any comment made?'' and answered, ''Mrs. Egr shook her head and didn't like it at the time. * * * No, she didn't say very much; she just shook her head.'' The plaintiff, referring to the same incident, said that was the first time that she had heard the document read. Referring further to the incident, she swore: ''Well, I was astonished; I didn't know what to say.''

From the above we see that the appellant for a long time had had the confidence of his parents and that, although the latter were satisfied with the medium to which they had resorted (an estate by the entirety) so that their property would descend upon the death of either to the survivor, the appellant induced his father to plan the writing of a will. We also see that the appellant and his wife virtually selected for the father the attorney who undertook to write the will and who shortly became entrusted with the preparation of the paper under attack. For that purpose they chose the appellant's stepson. We also see that the appellant and his wife were in his father's home when the plans for the will were made and when the typing was done. His own words were that he was ''in and out of the room'' at that time. From the record we also see that he was still there when the plan for a will was abandoned, and when the trust agreement was formulated he was again in the room. He was so familiar with the discussion that took place at that time that he was able to swear with positiveness, whether truthful or otherwise, that his parents fully understood the terms of the agreement. We also see that after the trust agreement was

typed it was mailed, not to the parents, but to him, and that it was he who delivered the paper to his parents. He presented it to them, not for their examination, but for their signatures. He even took it upon himself to advise his parents to sign this paper which made him trustee, provided for his compensation, gave him a fourth interest in the residue, and conferred benefits upon his son and his stepson. His own words were that he gave the advice "once or twice." So complete was the confidence which his parents reposed in him that they accepted his advice although they had not read the paper and had acquired virtually no information concerning its contents. Likewise, their confidence was so great that they did not ask that Mr. Ramstead, the scrivener, come to their home and explain the paper, nor did they seek the advice of their other three children. So intimate was the appellant's connection with these papers that he chose the notary public who attested the signatures and also the persons who became the subscribing witnesses. Then, too, the appellant made himself the custodian of the document after it had been signed and, as such, carried away the two duplicate originals, and, of course, the two deeds. When he departed, the parents were bereft of virtually all that they possessed and were his wards. And this had been brought about through their acceptance of his advice. When his mother hestitated a moment before signing the papers and asked that they be left in the home for a day or two so that she could look them over, the appellant denied the request. In other words, he foreclosed to his parents advice and assistance from outside sources and in so doing accepted the responsibility for the papers' faithful delineation of his parents' wishes concerning their property. The approaching death of his bedridden father and the resulting anxiety of his

aged mother forced them to lean upon some one, and for that purpose the appellant presented himself.

■ No argument and no citation to authority is required to justify the statement that a confidential relationship of unusual intimacy existed between the appellant and his parents. If it is asked whether his words under the circumstances were peculiarly persuasive with his parents, the evidence itself demonstrates that the answer must be in the affirmative: the parents yielded to his advice and signed the paper which he presented.

In view of the conclusion just expressed, the burden rested upon the appellant to come forth with evidence showing that the transaction under consideration was fairly consummated and that he did not abuse the confidence reposed in him by his parents. This duty required him to clear the transaction of all suspicious circumstances and show that it was a fair one for his parents. That duty was a just one in view of the fact that his parents while worried and distressed, and without adequate knowledge of the contents of the documents, signed them upon his advice. Since he introduced this transaction, was always present when it was under discussion, and brought it to a close by procuring his parents' signatures to the papers, he ought to be in a position to discharge the burden of proof just mentioned. In view of the fact that he said to Mr. Loder, in his mother's presence, ''It was for Mother's good that we were filling out these papers,'' it is not asking too much to require him to show how it was for his mother's good to burden her with the expenses of himself as a compensated trustee, and with his stepson as the trustee's attorney. Again, in view of the fact that he swore, ''The whole purpose of the trust agreement was to save

Mother a whole lot of expense so that there would be just as much money left as possible for her care," he ought to be in a position to name the expenses, if any, which this agreement would avoid. Without it title would have reposed in her without expense the very moment her husband died. But the trust agreement, in lieu of giving her title, would, if sustained, confer title upon him and impose upon her the expense of himself as trustee and of his stepson "in the same manner as if he were appointed attorney for our estates by wills." The appellant was actually asked concerning these matters. Here are his answers: "I don't know; I still think it is a good arrangement." Certainly, that was a most unsatisfactory answer and its very nature provoked the next question: "Why?" to which he answered, "I think that is the best arrangement that could be made for her at this time." That answer was untrue; she already had a better arrangement— the estate by the entirety. Another suspicious circumstance comes naturally to mind concerning which an answer could be expected from the appellant. It was phrased in the following language in the circuit court: "Why does it happen they are all members of your immediate family?" Of course, the reference was to himself, his son and his stepson. Here is his answer: "I don't see anything wrong about that." That was his only answer.

Should he seek to sustain the trust agreement upon a contention that the father feared that one of his children would impose upon the mother, the appellant ought to be in a position to designate the child. None of the children, except himself, seeks to sustain the agreement which itself appears to be as predatory as any indulged child could have been. The youngest of the Egr children was forty-three at the time of the trial and, so

far as the record indicates, there was harmony in the family until this trust agreement made its appearance. Likewise, no instance of prodigality upon the mother's part was mentioned by any one. But, assuming that the father feared that one of the children might seek to gain an improper share, it was unnecessary to create a trust of this nature in order to protect the mother.

We shall not pause to mention other suspicious circumstances that are suggested by the record. They are there, and it was the appellant's duty to remove the suspicion.

■ We are satisfied that the appellant has not shown that this transaction was a fair one for his parents; nor has he shown, in our opinion, that they were free from undue influence when they signed the papers under attack. In our opinion, he dominated his parents. We believe that they mistook the trust agreement for a will and that they did not know that they were irrevocably parting with title to and control over their property. It will be remembered that the agreement does not exact of the appellant a bond. We think the reason for that omission was that the parents did not realize that the appellant would become a trustee and, as such, acquire their property. Likewise, in our opinion, the parents were unaware of the provision in the agreement which would have made their grandson the trustee, if the appellant declined to act.

■ The mere fact that the appellant possessed the confidence of his parents and that they consulted with him certainly would not render the transaction invalid, if those were the only circumstances. Every son ought to have the confidence of his parents, and it is to his credit if he is consulted by them. But no one in a position of confidence has a right to abuse that trust. It

is the exercise, in circumstances such as the one before us, of undue influence which is prohibited, and, as was pointed out in *Brown v. Hilleary*, 133 Or. 26, 285 P. 953, undue influence is wrongful influence. Wrongful influence is prompted by selfish motives and seeks to promote self-interest. It seeks to accomplish self-service under a pretense of unselfish devotion to the other's welfare. When one in whom confidence has been reposed substitutes his own will or his own interests for those of the person who seeks his advice, his influence becomes wrongful; that is, undue. We are satisfied that the appellant was thinking of himself and planning for his own selfish interests at the times when he gave advice to his parents and exerted influence upon them. He sacrificed their welfare for his own gain. It follows, therefore, that he exercised undue influence. We believe that the challenged document is invalid.

The above disposes of every contention advanced by the appellant. We are satisfied that all of them lack merit. It is true that we have not discussed all of the authorities upon which the appellant relies, but none of them announced any principle of law foreign to those stated in preceding paragraphs of this opinion. We deem it unnecessary to set forth herein a review of the facts upon which they passed. The principles of law that govern these two cases are elementary and are familiar to everyone.

The two decrees of the circuit court attacked by these appeals are affirmed.