Argued and submitted September 9, 1988, in CA A41367, on appeal, judgment entered August 19, 1986, modified and remanded for determination of amount that trustee's account should be surcharged; otherwise affirmed; judgment entered July 7, 1987, modified to award trustee attorney fees for defending his accounts and remanded for determination of fees; in CA A44881, judgment modified on appeal to delete requirement in paragraph 5 of judgment entered June 11, 1987, requiring immediate distribution of all cash and assets other than real property; affirmed as modified; on cross-appeal, affirmed April 4, reconsideration allowed by opinion June 27, 1990

See 102 Or App 289 (1990)

MASTERS et al,
*Appellants,*

*v.*

BISSETT et al,
*Respondents.*

(A8407-04448; CA A41367)

In the Matter of the December 29, 1977
Rose Bissett Hefty Trust,

In the Matter of the Rudolph A. Bissett
Testamentary Residual Trust,

In the Matter of the November 10, 1969
Rose E. Bissett Trust.

MASTERS et al,
*Respondents - Cross-Appellants,*

*v.*

BISSETT et al,
*Appellants - Cross-Respondents.*

(A8407-04139; CA A41367)

In the Matter of the Residual Trust
Created under the Will of
Rudolph A. Bissett, Deceased,

MASTERS et al,
*Respondents - Cross-Appellants,*

*v.*

BISSETT,
*Appellant - Cross-Respondent.*

(A8407-04366; CA A44881)
(Cases Consolidated for Decision)

790 P2d 16

165-a

Michael J. Morris, Portland, argued the cause for Linda Masters et al, in CA A41367 and in CA A44881. With him on the briefs was Grebe, Gross, Peek, Osborne & Dagle, P.C., Portland.

Jacob Tanzer, Portland, argued the cause for Larry Bissett et al, in CA A41367, and for Larry Bissett in CA A44881. With him on the briefs was Ball, Janik & Novack, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

## BUTTLER, P. J.

This appeal involves three cases, two of which were consolidated for trial and on appeal (CA A41367). The third is consolidated with them for decision on appeal (CA A44881), because it involves facts common to all three cases. Plaintiffs are the grandchildren of Dr. Rudolf Bissett and are beneficiaries of a testamentary trust created by him and of two *inter vivos* trusts, one created jointly by him and his wife, Rose, and one created by Rose after his death. Defendant Larry Bissett is the sole surviving son of the trustors. He is the sole trustee of two of the three trusts and a co-trustee with his wife, Nancy, of the other.[1] He is also a beneficiary of two of the trusts. We will refer to him as trustee or Larry.

Because of the complexity of the background, we will describe the various trusts and the underlying transactions that form the basis of the litigation before responding to the numerous assignments of error.

### *Testamentary Trusts*

Dr. Bissett died in 1972, leaving a will containing a marital deduction trust. Trust A provided for income to Rose for her life, with a power to invade 20 percent of the corpus annually and a power of appointment over the corpus, in default of the exercise of which the assets would pour over into Trust B, the residual trust. In August, 1974, the trust was funded. Ultimately, the assets of Trust A were distributed to Rose.

Trust B also provided for income to Rose for her life, with the remainder to her sons, Robert and Larry, in equal shares, with the right of representation. Robert and Larry were co-trustees of both trusts. Robert died in 1977, survived by his wife and the four plaintiffs, at which time Larry became sole trustee. Trust B was also funded in August, 1974, with 50 percent (Dr. Bissett's share) of the assets of a general partnership that Rose and he had formed to manage the family's investments and by the residuary assets of his estate.

---

[1] Although Nancy was a co-trustee of the Rose Bissett Hefty Trust, for convenience we refer to Larry as trustee.

*Rose Bissett Hefty Trust*

In 1977, Rose (then married to James Hefty) created an irrevocable trust (Hefty Trust) for the benefit of Robert's children (grandchildren), which was to terminate when the youngest had reached age 40. Larry and Nancy were named trustees. Rose originally funded the trust with an undivided one-half interest in three parcels of real property, referred to as the Gearhart property, the River property and the Hall lot. The River property consisted of three and one-half acres of undeveloped land on the Tualatin River. The Gearhart property consisted of an undeveloped beach lot; it was sold in 1982, and the proceeds were invested in securities. The Hall lot was one of two lots that were later combined to form what the parties refer to as the Hall Boulevard property, the rest of which was in Trust B. When Rose conveyed the Hall lot to the Hefty Trust, it had on it the old family residence, which later burned down. The trust was terminated prematurely, as discussed more fully below.

*Sandpiper Trust*

In 1968, Dr. Bissett and Rose had purchased in their joint names vacation property in Palm Beach, California (the Sandpiper property). To avoid a California probate, they established a revocable trust in November, 1969, transferring that property to Robert and Larry, as trustees. The settlors were entitled to income for their lives; on the death of the survivor, the remainder was to go to Robert and Larry in equal shares, with the right of representation. Larry became the sole trustee in 1977, after Robert's death. By 1978, the Sandpiper property had appreciated in value. To minimize taxes on Rose's estate, Larry, as trustee, at Rose's direction and on the advice of counsel, conveyed it to Trust B in November, 1978.

In November, 1982, Rose decided that she wanted Larry and Nancy to have the Sandpiper property after she died. Trustee's counsel suggested a series of conveyances to effectuate a tax-free exchange, resulting in Rose's owning the property. She then conveyed the property to herself, Larry and Nancy, as joint tenants with rights of survivorship. Because of defects in the chain of title in the California deed records, the deed creating the joint tenancy was not recorded until 10 days after Rose's death in August, 1983, at which time title passed to Larry and Nancy by survivorship.

*Bissett & Bissett, Ltd.*

Bissett & Bissett, Ltd., a limited partnership, was formed to manage the family assets, effective January 1, 1978. It succeeded the general partnership that had existed before Dr. Bissett's death and had been continued by agreement of Rose and the personal representative of the doctor's estate. Originally, Larry, in his individual capacity, and Rose were the general partners. Larry, as trustee of Trust B, Larry and Nancy, as trustees of the Hefty Trust, and Larry and Nancy, in their individual capacities, were the limited partners.[2] In November, 1980, the Hefty Trust and Larry and Nancy, in their individual capacities, withdrew as limited partners, leaving Trust B as the sole limited partner. Larry and Rose remained general partners. Effective December 27, 1982, Rose withdrew as a general partner and withdrew her capital. Thereafter, except for Larry's nominal capital contribution of $100, Trust B provided all of the capital of Bissett & Bissett, Ltd.

At the time these disputes arose, Bissett & Bissett, Ltd., had been terminated and its assets had reverted to Trust B. The principal assets consisted of real property: (1) the Goodyear Building; (2) the Medical Building; (3) the Highway 217 Lot; and (4) the Voll Lot. The Goodyear Building was designed for, and leased by, Goodyear Tire & Rubber Company. It was the only income-producing property.[3] The Medical Building had originally housed Dr. Bissett's medical practice and had been vacant since 1982. The Highway 217 Lot is an unimproved remnant of a larger lot that had been condemned for Highway 217. The Voll Lot originally contained a small rental unit that was razed along with the old family residence on the Hall lot after the fire in 1980. In an effort to develop the property for commercial use, Larry cleared and regraded the property and combined the Voll and

---

[2] Their capital contributions were:

| | |
|---|---|
| Rose | $256,336 |
| Larry | 19,000 |
| Trust B | 286,174 |
| Hefty Trust | 38,000 |
| Nancy | 19,000 |

[3] In December, 1984, Larry renewed the Goodyear lease for a term of five years at $3,000 per month for the first 18 months, and $3,300 per month thereafter until February, 1990.

Hall lots in 1984 to form the Hall Boulevard property. At the time of trial, Trust B owned 50 percent of the Hall Boulevard property, Larry and Nancy owned 25 percent and the Hefty Trust owned the remaining 25 percent.

Trust B, by its terms, terminated when Rose died on August 7, 1983. Grandchildren initially proposed that they receive interests in the limited partnership in proportion to their interest in Trust B. Instead, Larry chose to dissolve the limited partnership and to make this in-kind distribution:

| Property | Appraised Value | *To Larry Bissett* | | *To Plaintiffs* | |
|---|---|---|---|---|---|
| | | Percent | Amount | Percent | Amount |
| Goodyear | $395,000 | 100 | $395,000 | 0 | -0- |
| Medical Bldg. | 230,000 | 0 | -0- | 100 | $230,000 |
| 1/2 Hall Blvd. | 141,250 | 0 | -0- | 100 | 141,250 |
| Hwy. 217 | 35,000 | 16.08 | 5,625 | 83.92 | 29,375 |
| | $801,250 | | $400,625 | | $400,625 |

Larry petitioned the court for an order approving his accounting, which, with grandchildren's objections, became the basis of what we will refer to as the accounting case. He also sought approval of his proposed distribution, which, with grandchildren's cross-petition, pursuant to ORS 128.135(2)(c), for a different distribution, became what we will refer to as the distribution case. They also filed a separate action seeking damages from trustee for various acts of mismanagement, breach of fiduciary duty and undue influence, which we will refer to as the damages case. Because of the similarity of issues, the accounting and the damages cases were consolidated (CA A41367) for trial. The distribution case was tried separately, (CA A44881).

The trial court, for the most part, approved the accounting[4] and ordered that the trusts be terminated. The judgment was entered on July 7, 1987. Trustee appeals and grandchildren cross-appeal from that judgment.[5] In the

---

[4] The trial court surcharged trustee's accounts in two respects, but the amount, in relation to the initial valuation of the trusts, is insubstantial. We discuss the matter more fully under grandchildren's first and fourth assignments of error.

[5] Because of the similarity of issues, grandchildren consolidated the issues on cross-appeal in the accounting case with the issues in their appeal in the damages case.

damages case, a judgment was entered on August 19, 1986, dismissing grandchildren's claims of mismanagement, breach of fiduciary duty and undue influence. They appeal from that judgment.[6] In the distribution case, a judgment was entered on June 11, 1987, modifying trustee's proposed distribution and ordering that all of the real property be distributed to beneficiaries as tenants in common. Trustee appeals, and plaintiffs cross-appeal, from that judgment. All parties seek attorney fees on appeal.

At the outset, we address the parties' confusion regarding the burden of proof and the scope of review in the damages case. In their consolidated appeal in the damages and accounting cases, grandchildren argue that trustee bears the burden of proving that expenses incurred were both reasonable and proper. That is true only in the accounting case: A trustee carries the burden of proving that his expenses were reasonable and proper and were made for trust purposes. *Gorger v. Gorger,* 276 Or 267, 555 P2d 1 (1976). However, in the damages case, grandchildren allege mismanagement, breach of fiduciary duty and undue influence. The first two charges amount to charges of breaches of trust. Therefore, grandchildren, as beneficiaries, bear the burden to prove in what respects Larry breached that duty. *See Nelson v. Portland Tr. & Sav. Bank,* 153 Or 19, 53 P2d 1051, 55 P2d 1105 (1936). An action by beneficiaries for breach of trust is an equitable proceeding, even if money damages are the only remedy sought. *Restatement (Second) Trusts* §§ 199, 205 (1959); *see Campbell's Gas Burner Co. v. Hammer,* 78 Or 612, 153 P 475 (1915). The burden of proof in a claim for undue influence is on the party asserting it. *In re Reddaway's Estate,* 214 Or 410, 329 P2d 886 (1958). We review all of the claims *de novo.*

In their first assignment of error, grandchildren contend that the trial court erred in failing to surcharge Larry for legal fees that he paid from the Hefty Trust in connection with a proposed termination and partial distribution of the trust, compensation that he paid himself for services rendered and expenses that he incurred in developing certain trust property.

The Hefty Trust was irrevocable and was to terminate when the youngest living grandchild reached age 40.

---

[6] Trustee filed a notice of cross-appeal from that judgment; it was withdrawn later.

Although no grandchild had attained that age, Rose and the grandchildren wanted a premature termination and distribution of the corpus. The trust agreement authorized trustee to employ attorneys to assist him in the performance of his duties, and Larry employed counsel with respect to the propriety of an early termination. On the advice of counsel, Larry conditioned a premature termination on grandchildren's execution of a consent and indemnity agreement, which provided that grandchildren would indemnify and hold trustees harmless if the trust were construed to provide contingent interests in other beneficiaries. Grandchildren delayed execution of the agreement for over a year, ostensibly because Larry had failed to provide an accounting. We find that the attorney fees Larry incurred in connection with that matter were reasonable and proper under the circumstances.

■ Subsequently, when the plan to terminate the Hefty Trust was abandoned in favor of a partial distribution of $6,000 to each beneficiary, Larry conditioned the distribution on grandchildren's execution of a document which would release him and Nancy from "any further claim, demand, action or liability of any nature whatsoever arising out of or in connection with the administration of the trust through June 30, 1982." Because grandchildren had learned that Larry had paid himself trustee's fees to which he was not entitled under the trust agreement, they refused to sign. Larry ultimately distributed the money without resolving that dispute.

We conclude that Larry's insistence on plaintiffs' signing that release was unreasonable under the circumstances; therefore, legal fees that he incurred in connection with the preparation of that release and his attempts to have it signed are not chargeable to the trust. The trial court should not have allowed them, and trustee's account should be surcharged accordingly. Because we are unable to discern from the record the amount incurred by Larry for that purpose, as distinct from the fees properly incurred in connection with the propriety of early termination and the preparation of the indemnity agreement, we remand to the trial court for a determination of the amount to be surcharged.

■ Grandchildren also contend that Larry should be surcharged for the legal fees that he charged to the trust that were

incurred when he sought legal advice as to his right to compensation as trustee. Although the Hefty Trust provided that trustee was to serve without compensation, legal counsel had interpreted the trust to preclude compensation for *ordinary* services but not for *extraordinary* services, for which the trust would otherwise have to pay. On that basis, Larry charged the trust for "extraordinary" services. The trial court found that Larry was not entitled to compensation and surcharged his account in the amount of $5,706.23, but did not surcharge him for the fees incurred for the legal advice. The trust agreement authorized Larry to employ counsel, which he did to interpret the trust agreement in order to advise him of his rights and obligations thereunder. The attorney fees only for that limited purpose were reasonable and proper, and we affirm the trial court.

■ Finally, grandchildren contend that Larry, as trustee of the Hefty Trust, incurred excessive and unnecessary expenses in developing the River property, which consisted of three and one-half undeveloped acres. He intended to sell it and hired a contractor to clear it of dense brush and fallen timber. The contractor gravelled a roadbed that extended to the river to facilitate removal of the debris. The Hefty Trust expressly authorized trustee to "manage, develop, improve, * * * change the character of * * * an estate asset in connection with the exercise of any power vested in the trust." We hold that trustee's actions were authorized by the trust and that the expenses were reasonable in order to make the property more marketable.

■■ The second assignment of error challenges the pretrial dismissal, pursuant to ORCP 21, of grandchildren's derivative action against Larry on behalf of Bissett & Bissett, Ltd. *Former* ORS 69.475 provided, in pertinent part:

"(2) In a derivative action, the plaintiff must be a partner at the time of bringing the action and:

"(a) At the time of the transaction of which the plaintiff complains; or

"(b) The plaintiff's status as a partner devolved upon the plaintiff by operation of law or pursuant to the terms of the partnership agreement from a person who was a partner at the time of the transaction."

To have standing, plaintiffs must plead and prove that they

were limited partners both at the time of the acts of which they complained *and* at the time the action was brought. They alleged that, by operation of law, they became limited partners on August 7, 1983 (when Rose died) and that they had filed a petition to compel distribution of Trust B to formalize their interest. They also alleged that *"Residual Trust B* was a limited partner of Bissett & Bissett, Ltd., at the time of the acts and transactions alleged [in the twelfth claim for relief]." (Emphasis supplied.) By that allegation, grandchildren appear to have assumed that, as a matter of law, distribution of Trust B had to be made as interests in the limited partnership. That assumption is not correct. Although Trust B was a limited partner, and grandchildren are 50 percent beneficiaries of Trust B, it does not follow, as a matter of law, that they were entitled to distribution of partnership interests. Under the terms of the trust, Larry had the power to retain trust property for such period as he might deem expedient and to distribute the principal in money, securities or other property. Grandchildren did not have the legal right to distribution of partnership interests. Accordingly, their complaint does not allege sufficient facts to give them standing to maintain a derivative action, and there was no error in dismissing it.

■ The third assignment of error concerns the amount that Larry should be surcharged in connection with the so-called "Anderson matter." Rose, Bissett & Bissett, Ltd., Trust B and Larry employed attorneys to pursue claims against Anderson, formerly an attorney for the family. After the attorneys failed to file an action against Anderson within the Statute of Limitations, a malpractice claim against them was settled. The settlement was insufficient to pay all of the expenses incurred and, as a result, Trust B had expended approximately $10,000 in unreimbursed legal fees. All expenses incurred in prosecuting the Anderson matter in 1982 were charged against income. Pursuant to a stipulation between the parties, trial on the "Anderson matter" was limited to the amount of damages that grandchildren suffered. The trial court surcharged Larry's account $4,992.74,[7] the amount by which expenses exceeded income received after 1982.

---

[7] Larry was entitled to credit his account $4,571.62, the amount that he had previously reimbursed Trust B for the Anderson expenses. Thus, the net increase to Trust B is approximately $420.

Grandchildren contend that Larry should bear the entire amount of the unreimbursed legal fees, because the limited partnership had no income in 1982 to offset those expenses. We find that income was received in 1982 from accrued interest on partners' draws that were treated as loans. Larry testified, without contradiction, that the limited partnership had treated partners' draws that way from the beginning to avoid an accounting and revaluation of partnership assets each time that a partner withdrew capital. The limited partnership had been on a cash basis, reporting income as it was received, rather than as it accrued. In 1982, it received and reported $33,816.67 in interest income. Accordingly, the trial court properly held that the expenses incurred in 1982 were offset by income, which inured to the benefit of the only limited partner, Trust B, of which Rose, who was then alive, was the sole income beneficiary.[8] There was no error.

In their fourth assignment, grandchildren contend that the trial court erred in failing to surcharge Larry for mismanagement of Trust A and Trust B. We consider the argument only as it relates to Trust B.[9] They contend that Larry, as trustee, breached his fiduciary duty by investing the assets of Trust B in Bissett & Bissett, Ltd, in which he had a financial interest. *See Marshall v. Frazier,* 159 Or 491, 530, 80 P2d 42, 81 P2d 132 (1938). Assuming that Larry breached his fiduciary duty in that respect, there is no evidence that, if grandchildren suffered damage by Larry's alleged mismanagement, the damage would have been any less if Larry had been acting as trustee, rather than as a general partner of the limited partnership. As trustee, he could have done what he did as general partner.

---

[8] Alternatively, grandchildren contend that, even if the 1982 expenditures were chargeable to income, they have standing to claim damages for diminution of Rose's estate. That contention was neither pleaded nor litigated in the trial court and, therefore, we do not reach it.

Grandchildren also argue that they are entitled to recoup the 1982 expenses derivatively on behalf of Bissett & Bissett, Ltd. We need not address that contention, given our disposition of the second assignment of error.

[9] On appeal, grandchildren argue that Larry wrongfully terminated Trust A. That contention was neither pleaded nor litigated. They briefed the issue *after trial,* but before the court rendered its opinion, which did not address the issue. Moreover, grandchildren's assignment fails to comply with *former* ORAP 7.19, in that the assignment relates to the trial court's approval of trustee's accounts, rather than the court's failure to address the allegedly improper termination of Trust A.

■ Alternatively, grandchildren contend that Larry's participation in Bissett & Bissett, Ltd., presented a conflict of interest, because he was entitled to receive compensation for his services as a general partner; whereas, they claim, he was not entitled to compensation for his services as trustee. Because their premise is wrong, so is their conclusion. Trust B did not provide that trustee would serve without compensation;[10] accordingly, trustee was entitled to reasonable compensation. *See Wood et al. v. Honeyman et al.,* 178 Or 484, 169 P2d 131 (1946); *McAfee et al. v. Thomas,* 121 Or 351, 255 P 333 (1927). We agree with the trial court that Larry's charges were reasonable and necessary. There is no contention that Larry received more compensation as a general partner than he would have been entitled to receive if he had been compensated as trustee.

■ In their fifth assignment, grandchildren contend that Larry breached his fiduciary duty to them as remaindermen of the Sandpiper Trust by distributing the Sandpiper property to Rose as part of her withdrawal of her capital from Bissett & Bissett, Ltd. Some background is necessary. The property had been conveyed to Trust B in 1978 for tax reasons. Acting on Rose's request, and pursuant to advice of counsel, on December 17, 1982, Larry, as trustee of Trust B, conveyed the property to Bissett & Bissett, Ltd., increasing the trust's capital account by $180,000, more than the property's fair market value. On December 27, 1982, Larry and Rose, as general partners of Bissett & Bissett, Ltd., conveyed the property to Rose as part of her withdrawal of her capital in connection with her termination as a general partner of Bissett & Bissett, Ltd., effective December 31, 1982. Rose's partnership capital account was reduced by $180,000.

Grandchildren do not dispute the conveyance of that property to Trust B. Neither do they contend that the fair market value of the property was more than $180,000, the value for which Trust B was given credit in its capital account in the limited partnership when the property was transferred to it. They concede that Trust B was not damaged on the

---

[10] Although the Hefty Trust did provide that its trustee would serve without compensation, it withdrew from the limited partnership in November, 1980. Grandchildren, however, assert only the blanket proposition that Larry was entitled to no compensation for *any* of his services as trustee.

balance sheet of the limited partnership when the property was distributed to Rose as part of her withdrawal of capital. Rather, they argue that, as beneficiaries of the trust, they were "damaged by the removal of an asset" from Rose's estate, which, they claim, amounted to a breach of Larry's fiduciary duty as trustee of Trust B.

We assume, for the purpose of this assignment, that Rose wanted to give Larry and Nancy a survivorship interest in the property. Larry, as trustee of Trust B, could have sold the property back to Rose for its fair market value. Legal counsel had rejected that idea for tax reasons and recommended the conveyance to the limited partnership, followed by a transfer to Rose as part of her capital account on her withdrawal from the partnership to effectuate a tax-free exchange. When Bissett & Bissett, Ltd., transferred the property back to Rose, she could have kept it, and grandchildren would have no grounds for complaint. Accordingly, if there is a problem with Rose's creating the joint tenancy with Larry and Nancy, it would be that she did so as the result of Larry's undue influence, the subject of one of the next two assignments of error.

In their sixth and seventh assignments, grandchildren challenge the trial court's failure to find that Larry exerted undue influence over Rose in connection with two transactions: (1) Rose's forgiveness in 1982 of a $60,000 loan that she made to Larry in 1978; and (2) her creating the survivorship interests in the Sandpiper property in 1982.

When Robert died in 1977, Larry was working toward a Ph.D at the Wharton School in Pennsylvania. Rose wanted him to return to Portland to manage the family assets. Eventually, she persuaded him to do so in 1978, and he and Nancy, on their return, decided to buy a condominium. In order to do so, they proposed to raise the $60,000 down payment by withdrawing their capital from Bissett & Bissett, Ltd., and borrowing the balance from the limited partnership. Rose suggested that Larry borrow the funds from her instead, which he did. The loan was evidenced by a note and provided for interest. Four years later, Rose forgave the loan. She and Larry were alone in her kitchen at the time, although Rose's husband was at home. Plaintiffs did not learn of the forgiven loan until this action was commenced.

■ One who asserts undue influence has the burden to prove it. However, an inference of undue influence arises when there exists a confidential relationship and there are suspicious circumstances. *In re Reddaway's Estate, supra,* 214 Or at 420; *McKee v. Stoddard,* 98 Or App 514, 520, 780 P2d 736, *rev den* 308 Or 660 (1989). A confidential relationship is a "fiduciary relationship, either legal or technical, wherein there is a confidence reposed on one side with a resulting superiority and influence on the other." *In Re Estate of Manillus Day,* 198 Or 518, 530, 257 P2d 609 (1953); *Doneen v. Craven, Executor et al,* 204 Or 512, 522, 284 P2d 758 (1955). When an inference of undue influence arises as a result of a combination of a confidential relationship and suspicious circumstances, the inference, if unexplained, may be sufficient, although the burden of proof remains with the one asserting undue influence. *See In Re Southman's Estate,* 178 Or 462, 168 P2d 572 (1946). If, however, a confidential relationship is not shown to exist, no inference arises, even if there are some suspicious circumstances surrounding the transaction.

■ ■ Here, grandchildren rely on the existence of both a confidential relationship and suspicious circumstances. There is no doubt that Rose had trust and confidence in Larry, her son and trustee. However, there must be, in addition, a showing that the one in whom confidence is reposed held a position of dominance over the other. *Doneen v. Craven, supra; Larson v. Naslund,* 73 Or App 699, 700 P2d 276 (1985). Undoubtedly, Rose relied on Larry to manage the family investments and had confidence in his advice. There was testimony that Rose did not always read documents that Larry presented to her for signature; rather, she signed some of them after listening to Larry's explanation. There is also evidence that Larry attempted to influence his mother with respect to her dealings with her grandchildren. However, grandchildren's own witness testified that Larry's attempts in this regard were ineffective.[11]

---

[11] For example, shortly after Larry became sole trustee in 1977, he told grandchildren and their mother not to discuss family business matters with Rose. He informed them that he was going to tell Rose not to discuss business matters with them. Janet Bissett, grandchildren's mother, testified that, if Larry ever did tell his mother not to discuss business matters, Rose did not pay attention to him. She and Janet still "talked business."

The record also shows that Larry resisted the premature termination of the Hefty Trust, which Rose and beneficiaries wanted. Rose insisted, and Larry finally acceded to the termination. Rose then became upset with grandchildren for refusing to sign the release that Larry required of them before he would distribute the assets. However, the dispute lasted so long that she finally became upset with Larry. According to Janet Bissett, Rose told her:

> "Well, this has just gone on long enough, and I'm going to phone Larry up right now and tell him to pay that money to the children. I want them to have it now, and it's my money, and I can do what I want with it."

Although there is some evidence of Larry's attempts to get the upper hand with respect to grandchildren, we find that Rose had a mind of her own and acted on it. She led a vigorous life, independently of her son. Having remarried after Dr. Bissett's death, she did not live with Larry. She was not financially dependent on him, even though she received monthly income from Trust B. She managed her own personal finances without any assistance or direction from Larry. Even in complicated financial transactions, Rose actively participated in the discussions. There is no evidence that Rose was incompetent or was an "enfeebled elderly woman who relied on her son for everything." *Larson v. Naslund, supra,* 73 Or App at 702; *compare Stricklin v. Stricklin,* 97 Or App 227, 776 P2d 18, *rev den* 308 Or 660 (1989). Grandchildren have failed to prove a confidential relationship as that term is defined in undue influence cases.

Accordingly, no inference of undue influence arises to aid beneficiaries' burden of proof, even if there are some suspicious circumstances. Rose forgave the loan on November 20, 1982, at or near the same time that she decided to give the Sandpiper property to Larry and Nancy on her death. Certainly the close proximity in time and the total amount of the gifts invites our scrutiny. However, there is evidence that, as early as 1978, Rose had consulted an attorney about changing her will to leave all of her cash and her home in Charbonneau to Larry. In her last will, executed in 1982, she did leave $40,000 to Larry to the exclusion of grandchildren.

Grandchildren contend that the fact that they did not learn of the loan forgiveness until after Rose's death arouses

suspicion. However, Rose was most anxious to have Larry and Nancy return from Pennsylvania to be with her and to manage the family assets. When they did so, she not only loaned them $60,000 to buy a house but took an active part in helping them find one. In returning to Oregon, Larry gave up a promising academic career and Nancy gave up a good job. Although grandchildren dispute that, it is clear that Rose believed that to be the case and had mentioned it to others. If any suspicion arises from grandchildren's not having learned of the loan forgiveness until after Rose's death, it is not sufficient to prove undue influence.

■ With respect to Rose's creating the survivorship interest with Larry and Nancy, much of what has been said indicates that Rose wanted them to have that property after she died. She appreciated their having returned to Oregon at her urging. It was her idea, and the only question was how to accomplish it. She obtained independent legal advice concerning the matter, during which her will, her estate plan and alternatives to creating the joint tenancy were discussed. She chose the joint tenancy. The only suspicious circumstance worth mentioning is Larry's failure to record the deed in California promptly. The delay is explained adequately and, even if the deed had been recorded immediately, it is questionable whether grandchildren would have received actual notice of the conveyance. As the trial court pointed out, if it was to be a secret, it was not well kept, because Rose had told her husband's daughter-in-law about it. We conclude that the Sandpiper conveyance and the loan forgiveness were not the result of undue influence.[12]

We turn to Larry's four assignments of error in his appeal in the accounting case. First, he contends that the trial court erred in denying his motion to be indemnified for $9,002.38, the amount that he incurred over the $5,000 that he had not distributed, in defending his actions as trustee of the

---

[12] In the absence of a confidential relationship, we need not discuss the various "factors of importance" articulated by the Supreme Court in *In Re Reddaway's Estate, supra,* that might support an inference of undue influence. We have mentioned some of those factors without cataloging them, on which there is evidence that might be used to prove undue influence. The others are not worth discussing. Grandchildren have argued their case solely on the analysis in *Reddaway.* Accordingly, we have not discussed whether there might be a different analysis under *Toomey v. Moore et ux,* 213 Or 422, 325 P2d 805 (1958).

Hefty Trust. The trial court found that the expenses were reasonable and necessary but held that distribution of the Hefty Trust constituted a waiver of trustee's right to be indemnified from the property distributed. On appeal, Larry urges us to permit indemnity against grandchildren personally, relying on *Restatement (Second) Trusts* § 249(2).

Section 249(2) provides a right of indemnity against beneficiaries personally after trust property has been distributed, unless beneficiaries can show either (1) that the trustee manifested an intention to forego his claim to indemnity or (2) that the beneficiaries so changed their position that it would be inequitable to compel them to indemnify the trustee. The illustrations of the application of the rule suggest that it applies to expenses incurred *before* the distribution of trust assets and, therefore, would be of no benefit to Larry in this case.

Without deciding whether section 249(2) might be applied in other contexts, we believe that, when a trustee distributes substantially all of the trust assets before his accounting of the trust has been approved by the beneficiaries or by a court order, the trustee is not entitled to reimbursement from the beneficiaries or the property for expenses later incurred in settling his accounting. ORS 128.135 provides the appropriate method for obtaining court approval of a trustee's accounting over objections, if any, of the beneficiaries. Because Larry did not invoke that procedure before distributing substantially all of the trust assets, even though he had not been able to obtain plaintiffs' voluntary approval of his accounting for the Hefty Trust, he is not entitled to indemnification from grandchildren personally for the expenses incurred in defending his accounting.

In his second assignment, Larry contends that the trial court erred in denying him compensation for his own services in defending the damages case. He seeks compensation for the amount of time that he had to devote to the trial that deprived him of the opportunity to engage in remunerative work. Although ORS 128.009(3)(z) authorizes a trustee to defend actions against himself, it does not require the trust to pay the trustee for amounts that he might otherwise have earned during the time that he devoted to his own defense. The trial court properly denied his request.

■ In his third assignment, Larry contends that the trial court erred in denying him indemnification for attorney fees incurred in the defense of his accountings as trustee for 1985 and 1986. ORS 128.009(3)(x) authorizes a trustee to employ persons, including attorneys, to assist the trustee in the performance of his administrative duties. Given the right to employ attorneys, a trustee must also have the authority to pay them from trust assets. Trust B empowers trustee to employ attorneys to assist in the performance of his administrative duties. The Hefty Trust provides that "trustee shall be entitled to reimbursement of expenses necessarily incurred." A trustee is authorized by ORS 128.135(2) to petition the court for approval of his accounts. Petitioning the court for approval of accounts is an administrative function of the trustee; accordingly, trustee is entitled to reimbursement, unless his retaining counsel for that purpose was imprudent or in breach of his fiduciary duty. There is no evidence here that it was, and the trial court did not so find. Accordingly, we remand to determine the reasonableness of the fees incurred,[13] giving due regard to fees incurred defending against objections that have been sustained.

■ We turn to Larry's appeal in the distribution case. He first assigns error to the court's order redistributing the Trust B assets. The trust authorized distribution in "money, securities or other property at the market value at the date of distribution * * * and the judgment of the Trustees as to what shall constitute a just and proper division or apportionment among the beneficiaries shall be binding and conclusive on all parties." Ostensibly, Larry's distribution of the properties resulted in an equal division, based on the appraised values of the properties distributed. However, Larry received 100 percent of the Goodyear Building—the only income-producing property. The court's redistribution made the parties tenants in common in each of the properties.

Larry contends that, because he was empowered to distribute the trust assets in any reasonable manner and his division was binding on all parties, the court overstepped its bounds by interceding. He relies on *Rowe v. Rowe,* 219 Or 599,

---

[13] Because the damages and the accounting cases were consolidated for trial, on remand the attorney fees incurred in defending the damages case must be segregated from those incurred in defending the accounting case.

347 P2d 968 (1959), for the proposition that a trial court may not overrule a trustee, unless there is no reasonable basis for the trustee's actions. In *Rowe,* the court interpreted the trust agreement as granting the trustee power to *pay or withhold* from the life beneficiaries the *income or principal* "entirely according to his own judgment and discretion." Accordingly, it held that a court could not interfere with the trustee's exercise of that discretion, in the absence of dishonesty or dishonest motive. The trustee in *Rowe* was not a beneficiary under the trust, as is the case here. Moreover, *Rowe* predates the enactment of ORS 128.135, which authorizes the court to review the propriety of a trustee's actions on the petition of any beneficiary.

Grandchildren's petition was brought pursuant to ORS 128.135(2)(c) to obtain instructions as to the equitable distribution of the trust estate. ORS 128.135(6) permits the court to give directions or instructions as "appear to it to be most beneficial to all beneficiaries of the trust." We need not decide whether the statute gives the court unbridled discretion to direct distribution of the assets, because we conclude that trustee's distribution to himself of the only income-producing property was, at least in part, the result of an improper motive—to benefit himself at the possible expense of the other beneficiaries. He argues that he did so in order to avoid his becoming entangled with the other beneficiaries as tenants in common. Although it is apparent that the parties have been unable to get along, Larry's distribution did not completely avoid that problem. Furthermore, he could have distributed the Goodyear Building to grandchildren and the other property to himself. The trial court's redistribution was within its statutory authority, was beneficial to *all* beneficiaries of the trust and was within its discretion.

■■■ In his second assignment of error, relying on *Hatcher v. U.S. Nat'l Bank,* 56 Or App 643, 643 P2d 359 (1981), *rev den* 293 Or 373 (1982), Larry contends that the trial court erred in awarding grandchildren their attorney fees. His reliance is misplaced. *Hatcher* is not only a different kind of case, but it predates ORS 128.155, which vests in the trial court discretion to award attorney fees to successful beneficiaries who petition the court pursuant to ORS 128.135. Here, grandchildren, as beneficiaries, petitioned the court to compel a distribution under ORS 128.135(2)(c). They were successful in obtaining a

more equitable distribution than had been proposed and attempted by Larry. The trial court acted within its discretion in awarding them attorney fees.

 In his third assignment of error, Larry contends that the trial court erred in requiring immediate distribution of all liquid assets of Trust B before the payment of trust expenses, in particular, attorney fees incurred by him in defense of his accountings. We agree. Given our disposition on appeal, Larry might be entitled to attorney fees expended in defense of his accountings for 1985 and 1986. Trust B has liquid assets and ongoing rental income from the Goodyear Building that should be applied first to trust expenses before distribution. If expenses should exceed the liquid trust assets and income, Larry, as well as grandchildren, will be secured by an equitable lien on the real property.[14]

 In their cross-appeal in the distribution case, grand-children contend that the court erred in failing to assess costs and attorney fees against Larry, individually, instead of against the trust, which is permitted by ORS 128.155. The trial court acted within its discretion.[15]

The requests of both parties for attorney fees on appeal are denied.

In CA A41367, on appeal, judgment entered August 19, 1986, modified and remanded for determination of amount that trustee's account should be surcharged; otherwise affirmed; judgment entered July 7, 1987, modified to award trustee attorney fees for defending his accounts and remanded for determination of fees. In CA A44881, judgment modified on appeal to delete requirement in paragraph 5 of judgment entered June 11, 1987, requiring immediate distribution of all cash and assets other than real property; affirmed as modified; on cross-appeal, affirmed.

---

[14] Larry also contends that the trial court improperly limited the security for his indemnification to a non-foreclosable lien, instead of a mortgage. We cannot determine whether and how the alleged error was preserved below and, therefore, we do not reach it. In any event, both he and grandchildren are protected by the equitable lien created by the judgment.

[15] We do not discuss trustee's fourth assignment of error or grandchildren's second assignment of error in their cross-appeal in the distribution case. The arguments duplicate those discussed above in connection with trustee's third assignment of error in his cross-appeal in the accounting case.