554 July 2, 2025 No. 581

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of the Estate of Amy Ludean Holmes,
Deceased.

Christopher ASBRIDGE,
*Appellant,*

*v.*

Kathy LONGORIA,
*Respondent.*

Klamath County Circuit Court
18PB00277; A178304

Dan Bunch, Judge.

Argued and submitted February 4, 2025.

Theodore W. Reuter argued the cause for appellant. Also on the opening brief was Reuter Law Office. Also on the reply brief was Reuter Corbett LLP.

Nathan J. Ratliff argued the cause for the respondent. Also on the brief was Parks & Ratliff, P.C.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

AOYAGI, P. J.

Affirmed.

## AOYAGI, P. J.

This appeal arises from a dispute over which of two wills executed by the decedent, Amy Holmes, is valid. The first will, executed in July 2015, splits the decedent's estate equally among her three children—Carol Hood, Kenneth Holmes, and Kathy Longoria—and names Christopher Asbridge, who is married to Hood's daughter, as personal representative. The second will, executed in May 2017, leaves most of the decedent's estate to Holmes and Longoria and their children, essentially disinherits Hood and her children, and names Holmes and Longoria as personal representatives. After the decedent's death, Asbridge filed a petition to probate the 2015 will, and Holmes and Longoria filed a competing petition to probate the 2017 will. The trial court ruled after a four-day trial that the 2017 will was valid and superseded the 2015 will. For the reasons explained below, we grant *de novo* review, and we affirm.

### FACTS

Asbridge requests that we exercise our discretion to decide the case *de novo*. *See* ORS 19.415(3)(b) ("Upon an appeal in an equitable action or proceeding other than an appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals, acting in its sole discretion, may try the cause anew upon the record or make one or more factual findings anew upon the record."); ORAP 5.40(8)(c) (we will exercise that discretion "only in exceptional cases"). Under the particular circumstances of this appeal, we agree that it is appropriate to do so, given two related considerations. First, we are unable to discern from the trial court's opinion letters which underlying legal path it took to the conclusion that the 2017 will is not the product of undue influence, which significantly impedes our ability to identify the court's implicit factual findings as necessary to apply the non-*de novo* standard of review. Second, this case has been in litigation since 2018, the only remaining defendant died after trial and now appears through the personal representative of his estate,[1] and the original trial judge has retired. Under the circumstances, conducting *de novo* review has

_____

[1] Since Holmes's death, Longoria has been acting as his personal representative in this litigation. For ease of reference, we refer to both Holmes and his estate as "Holmes."

significant benefits for judicial efficiency and bringing this
case to resolution. We therefore grant *de novo* review and
state the historical facts as we find them, based on the trial
evidence. We defer only to the trial court's demeanor-based
credibility findings.[2] *Dept. of Human Services v. H. R. E.*,
297 Or App 247, 248 n 3, 441 P3d 726 (2019).

    The decedent and her husband Carl had three chil-
dren—Hood, Holmes, and Longoria. Prior to 2014, Longoria
and Holmes were "on the outs" with the decedent and rarely
visited home, whereas Hood and her husband were very
close with the decedent and Carl. They went on many vaca-
tions together and spent a lot of time together. Hood and
her husband bought a home with space for the decedent
and Carl, although the decedent and Carl never moved in
because they wanted to maintain their independence.

    After Carl died in 2014, the decedent's relationships
with her children changed, in part because the decedent
was unhappy with things that she perceived Hood to have
said or done while Carl was dying. The decedent had neg-
ative feelings toward Hood after Carl's death and, accord-
ing to her neighbor, had "nothing good to say" about Hood.
Meanwhile, Longoria and Holmes visited the decedent much
more frequently after Carl's death.

    In April 2015, Holmes took a large amount of cash
from a safe in the decedent's home, without her permis-
sion. The decedent was initially very upset with him, but
he returned most of the money, and she ultimately forgave
him. Soon thereafter, Holmes and his wife began divorce
proceedings. It was a contentious divorce, and Holmes's sons
sided with their mother, which upset the decedent. Whether
or not it was true, the decedent also perceived Hood to side
with Holmes's wife. During his divorce, Holmes moved in
with the decedent and lived there for six months to a year.

_____

    [2] We understand the trial court to have made some express and implied
demeanor-based credibility findings. For example, it found "very credible"
Longoria's "testimony that it was [the decedent] who insisted upon changing her
estate plan absent any prompting from [Longoria]," which, on this record, we
understand to reflect a demeanor-based credibility assessment, rather than "a
comparison of the witness' testimony with the substance of other evidence." *H. R.
E.*, 297 Or App at 248 n 3 (internal quotation marks omitted). As such, it is the
type of finding to which we defer even on *de novo* review. *Id.*

In July 2015, the decedent executed a will that was drafted with the assistance of an attorney. It split her estate equally among her three children, and it made Asbridge the personal representative. The decedent was unhappy with how much it cost to get the will drafted, and that the final will contained some typos, but the substance of the will reflected her wishes and intentions for her estate at that time.

From 2015 to 2017, Holmes and Longoria were very involved in the decedent's life, and Hood was not. Holmes and Longoria would stay at the decedent's house periodically. They helped around the house and yard at times, although the decedent also hired a housekeeper starting in 2016. Longoria and the decedent got haircuts together, went shopping together, and went to the casino together. In late 2016, the decedent asked Longoria to help balance her checkbook, and, around the same time, the decedent moved her banking to First Community Bank, where Longoria banked. Meanwhile, the decedent had very limited contact with Hood, even though she lived only a few blocks from the decedent. Hood called five to ten times a year, but they did not see each other in person in 2016 or 2017.

During this period, the decedent decided to change her will. She first told Longoria that she wanted to change her will in 2016, but not to tell anyone. In early 2017, the decedent asked Longoria to draft a new will. She and Longoria discussed hiring an attorney, but the decedent did not want to pay for one after the 2015 experience. Longoria researched how to draft a will in Oregon without an attorney. There were multiple drafts of the new will (at least two and perhaps as many as five) over several months, because the decedent kept making changes. Longoria drafted the final version in May 2017. It left most of the decedent's estate to Holmes and Longoria and their children, including proceeds from the sale of the house; essentially disinherited Hood and her children, leaving them $100 each with a reference to their part "in Kenneth's divorce"; made minor adjustments to the amount left to various grandchildren; and named Holmes and Longoria as the personal representatives. The decedent executed the 2017 will in her home, with friends of Holmes and Longoria serving as witnesses.

In August 2017, the decedent, who was suffering from cancer and other ailments, began receiving hospice care in her home, which consisted of a visit from a hospice nurse every other week. Even then, however, she continued to live alone and manage her own affairs within her physical capabilities, including grocery shopping and cooking (with some assistance). She continued to drive and renewed her driver's license in November. She also continued to manage her own finances, including meeting with a bank employee on her own to talk about her financial plans.

In November 2017, the decedent called the bank and expressed concern about how her bills would get paid if something happened to her, and a bank employee suggested that she could add someone to her account, who would then have direct access to the funds, or designate a pay-on-death (POD) beneficiary, who would receive the funds in the event of her death. The decedent decided not to add anyone to the account, as she wanted to retain full control of it during her lifetime, but she designated Holmes and Longoria as POD beneficiaries. Given the decedent's declining health, a bank employee brought the POD paperwork to the decedent's house, and both Holmes and Longoria were present when the decedent signed it.

In early December 2017, the decedent fell and broke her wrist, after which point her health declined rapidly.

During the second or third week of December, Hood's daughter had an upsetting phone call with the decedent that prompted Hood to go to the decedent's house. Holmes physically blocked her from entering the house, and Hood left without talking to the decedent. Hood believed that the decedent was upset because she thought a stranger was trying to break in, whereas Holmes claims that the decedent gave him "strict orders" not to let Hood into the house and was upset that she was trying to force her way in.

The decedent died on December 26, 2017. Holmes and Longoria did not notify Hood of her death until almost two weeks later.

Upon learning of the decedent's death, Asbridge petitioned the court to probate the 2015 will. Holmes and

Longoria filed a competing petition to probate the 2017 will. Asbridge filed an answer and counterclaims to their petition in which he asserted, as relevant here, undue influence and conversion of estate property.[3]

Asbridge and Longoria reached a settlement during the trial, resolving all claims between them. The case proceeded as to Asbridge and Holmes. After a four-day trial, the trial court decided that the 2017 will was duly executed and not the product of undue influence, and it ordered the will to probate. The court also rejected Asbridge's undue-influence challenge to the POD designations for the decedent's bank account and Asbridge's conversion claim. Asbridge appeals the resulting limited judgment.

## ANALYSIS

In his first assignment of error, Asbridge contends that Holmes failed to prove that the 2017 will was duly executed, as well as claiming that Longoria should be judicially estopped from asserting its validity, in her role as personal representative for Holmes's estate, given her own settlement with Asbridge as reflected in a stipulated judgment entered in September 2019. Judicial estoppel "is a common law equitable doctrine that applies to prevent a litigant who has benefitted from a position taken in an earlier judicial proceeding from taking an inconsistent position in a later proceeding." *Jones v. Randle*, 278 Or App 39, 41, 373 P3d 1186 (2016).

We are unpersuaded that Longoria should be judicially estopped from arguing in favor of the 2017 will in her role as personal representative of Holmes's estate. The settlement agreement memorialized in the stipulated judgment did not anticipate Holmes's death two years later and does not cover this scenario in our view. Moreover, in the hearing at which the settlement was put on the record, Longoria did not make any stipulation or admission that the 2017 will was invalid; if anything, she did the opposite, with her attorney putting on the record that there was "no admission of guilt on either part" and the court affirming that statement. Lastly, to the extent that Asbridge invokes judicial estoppel

---

[3] Asbridge also asserted an elder abuse claim, which he voluntarily dismissed, and a claim of lack of testamentary capacity, which he lost at trial and is not at issue on appeal.

to suggest that Longoria should not have been allowed to testify at trial given the settlement, we reject that argument both because no objection was made to her testimony, so the issue is unpreserved, and because nothing in the settlement agreement precluded her from testifying. We decline to apply judicial estoppel.

As for whether the 2017 will was duly executed, Asbridge contends that Holmes failed to prove that it was executed in accordance with ORS 112.235, which addresses the required formalities to execute a will. His argument on that point is brief and reduces to suggesting that the testimony of one of the witnesses to the 2017 will calls into question whether the version she signed is the same one that was offered for probate. *See Kastner v. Husband*, 231 Or 133, 135, 372 P2d 520 (1962) (proponent of the will has the burden to establish the will was duly executed). Having considered that witness's testimony about the will signing, as well as Longoria's testimony that it was the same will (which we understand the trial court to have credited based on her demeanor), we are persuaded that the 2017 will offered for probate is the duly executed will of the decedent that the witnesses signed.

In his second assignment of error, Asbridge contends that the 2017 will was the product of undue influence. A will is the product of undue influence if someone "gained an unfair advantage by devices which reasonable people regard as improper." *Harris v. Jourdan*, 218 Or App 470, 491, 180 P3d 119, *rev den*, 344 Or 558 (2008) (internal quotation marks and brackets omitted). In other words, there is nothing inherently problematic about someone influencing another person's estate choices, even directly, so long as they do not use improper devices that render the influence "undue." To some extent, "every will is the product of some kind of influence"; the question is "whether the influence in a particular case is 'undue.'" *Id.* (internal quotation marks omitted). A will resulting from undue influence is invalid due to not reflecting the testator's own intentions for their estate:

> "The theory which underlies the doctrine of undue influence is that the testator is induced by various means to execute

an instrument which, although his, in outward form, is in reality not his will, but the will of another person which is substituted for that of testator. Such an instrument, in legal effect, is not a will at all. Although executed by the testator, his intention to make a will is so defective that the instrument is invalid."

*In re Estate of Porter*, 192 Or 483, 494, 235 P2d 894 (1951); *see also In re Reddaway's Estate*, 214 Or 410, 418, 329 P2d 886 (1958) (describing the above statement from *Porter* as "simply a manner of expressing the idea that but for the wrongful influence exercised upon the testator he would not have executed the will").

Asbridge contends that the facts of this case give rise to a presumption of undue influence that Holmes failed to overcome. We are unpersuaded. A presumption of undue influence arises when the will challenger shows (1) that a confidential relationship existed between the decedent and the beneficiary of the challenged will, and (2) there is at least some evidence of suspicious circumstances surrounding the procurement or execution of the will. *Williamson v. Zielinski*, 326 Or App 648, 651, 532 P3d 1257 (2023). A confidential relationship coupled with even "slight evidence" of suspicious circumstances is enough to trigger the presumption. *Hoover v. Trowbridge*, 27 Or App 231, 237, 555 P2d 785 (1976). The presumption may be overcome, but it is the will proponent's burden to overcome it. *Williamson*, 326 Or App at 651.

Here, there is evidence of suspicious circumstances, as we discuss more later. *See Reddaway's Estate*, 214 Or at 421-24 (identifying seven suspicious circumstances relevant to whether a presumption arises). However, we are unpersuaded that a confidential relationship existed between the decedent and Holmes or Longoria.[4] Without a confidential relationship, the presumption does not arise.

---

[4] Holmes argues on appeal that, because he is now the only proponent of the 2017 will (given Longoria's settlement), we should decide only whether Holmes unduly influenced the decedent with respect to the 2017 will and not consider whether Longoria did so. We reject that argument. If the 2017 will was the product of undue influence by anyone, it would be invalid. *Porter*, 192 Or at 494. The identity of the will proponent in the particular litigation does not change the undue-influence analysis.

There is no "hard and fast" definition of a confidential relationship. *Egr v. Egr et al.*, 170 Or 1, 8, 131 P2d 198 (1942) ("Equity will never bind itself by any hard and fast definition of the phrase 'confidential relation.'" (Some internal quotation marks omitted.)). "[C]ourts lay stress on various factors[,]" but "[t]here is always, of course, the actual placing of trust and confidence on at least one occasion, and often such reliance has been exhibited through a series of months or years." *Id*. (internal quotation marks omitted); *see also Kugel v. Pletz*, 22 Or App 248, 252, 538 P2d 962 (1975) (describing a confidential relationship as involving "a confidence reposed on one side with a resulting superiority and influence on the other" (internal quotation marks omitted)). Often, a confidential relationship is described as one in which a person holds "a position of dominance over the testator." *Knutsen v. Krippendorf*, 124 Or App 299, 308, 862 P2d 509 (1993), *rev den*, 318 Or 381 (1994). Dominance may involve "an authoritative, controlling person bull[ying] or direct[ing] the actions of a subservient one," or it may be "expressed more subtly, such as by suggestion or persuasion or by fostering a sense of need and dependence." *Id*. at 309. As described in the *Restatement*:

> "Whether a dominant-subservient relationship exists is a question of fact. The contestant must establish that the donor was subservient to the alleged wrongdoer's dominant influence. Such a relationship might exist between a hired caregiver and an ill or feeble donor or between an adult child and an ill or feeble parent."

*Restatement (Third) of Property* § 8.3 comment g (2003).

The fact of a parent-child relationship does not, in and of itself, establish a confidential relationship. *Ingersoll v. Ingersoll*, 263 Or 376, 379, 502 P2d 598 (1972) ("The trial court * * * incorrectly assumed that the relationship of parent and child, without more, constitutes evidence of a confidential relationship sufficient to create a presumption of fraud or undue influence."). There must be evidence that, "in addition to the relationship of parent and child, there exists between a testator and the child a confidential relationship, as where the child attends to all of his parent's business * * *." *Porter*, 192 Or at 491. It is a question of fact whether a

parent and child had a confidential relationship in a given case (and at a given point in time). *Smith v. Ellison*, 171 Or App 289, 295, 15 P3d 67 (2000).

In *Porter*, 192 Or at 496, a confidential relationship existed between the testator and her adult daughter where the testator and her husband made transfers to their daughter that divested them of virtually all of their visible assets, after which they were "largely dependent" on her, including financially, and had no one else to look to except their daughter, who "controlled the purse strings." Similarly, in *Hoover*, 27 Or App at 237-38, a confidential relationship existed between the testator and his adult daughter where she transacted much of his financial business, was a joint signatory on his bank accounts, occasionally comingled her funds with his, lived across the street from him for many years and frequently visited his home, performed many tasks for him, and "in general assisted and was relied upon by him in a wide variety of ways." Conversely, in *O'Brien v. Belsma*, 108 Or App 500, 506, 816 P2d 665 (1991), a confidential relationship between the testator and her adult daughter was not proved where the testator supported her daughter but there was "overwhelming" evidence that the daughter was "not dominant over her mother" and was in fact "subservient to her mother." (Emphasis omitted.)

Of course, there are many different permutations of parent-child relationships and a spectrum along which assistance to an elderly parent may fall. "The practical difficulty *** arises out of the difficulty in determining the point at which the amount and kind of assistance which a child renders to [a] parent makes the child a confidential advisor." William Herbert Page & Robert N. Cook, *Treatise on the Law of Wills* § 821 (3rd ed 1941-1958); *see Porter*, 192 Or at 491 (citing that treatise section favorably).

In this case, there is evidence that the decedent had a close relationship with both Longoria and Holmes during the relevant time period, but we are unpersuaded that she had a "confidential relationship" with either of them. During the period in spring 2017 when the will was drafted and executed, the decedent was living alone, doing her own shopping and cooking, paying her own bills, and generally very

independent according to the assessment of multiple witnesses. Longoria and Holmes provided some assistance with tasks—such as helping around the house and, in Longoria's case, balancing the decedent's checkbook when asked—but not to such a degree as to establish dominance.

Because no confidential relationship existed (or at least was not proved), there is no presumption of undue influence for Holmes to overcome. Instead, the burden stays on Asbridge to prove undue influence. *Knutsen*, 124 Or App at 308. And we are ultimately unpersuaded that the 2017 will was the product of undue influence.

We consider the circumstances as a whole in deciding whether undue influence occurred, with an eye toward the ultimate question of whether the will reflects the testator's own judgment or that of an undue influencer:

> "'The degree of persuasion that is unfair depends on a variety of circumstances. The ultimate question is not merely whether the persuasion induced the transaction, for such persuasion is often permissible, but whether the result was produced on the one hand by influencing a freely exercised and competent judgment or on the other by dominating the mind or emotions. The weakness or dependence of the person persuaded is a strong circumstance tending to show persuasion may have been unfair.'"

*Egr*, 170 Or at 8 (quoting *Restatement of the Law, Contracts* § 497 comment c (1932)).

The parties frame their undue-influence arguments around the *Reddaway* factors, *i.e.*, whether the alleged undue influencer participated in the preparation of the will, whether the testator received independent advice from counsel, whether the will was prepared in secrecy and haste, whether the testator's attitude toward others had changed by reason of her relationship with the alleged undue influencer, whether the disposition of property is different from a prior will, whether a reasonable person would regard the disposition of property as unnatural, unjust, or unfair, and whether the testator was susceptible to undue influence. *Reddaway's Estate*, 214 Or at 421-24. Strictly speaking, the *Reddaway* factors do not apply in the absence of a confidential relationship. *Masters v. Bissett (A41367)*

*(A44881)*, 101 Or App 163, 179 n 12, 790 P2d 16, *adh'd to as modified on recons*, 102 Or App 289, *rev den*, 310 Or 547 (1990), and *rev den*, 311 Or 87 (1991). However, the suspicious circumstances identified in *Reddaway* are certainly relevant in assessing whether undue influence occurred—they are just not dispositive.[5] We therefore consider them, with that important caveat. *See, e.g.*, *O'Brien*, 108 Or App at 506 (considering the *Reddaway* factors in a case where the presumption did not arise); *Masters*, 101 Or App at 179 n 12 (considering some of the *Reddaway* factors).

Having considered all of the evidence and the facts as we have found them, we are unpersuaded that the 2017 will was a product of undue influence. There were certainly some suspicious circumstances surrounding its drafting and execution. Longoria drafted the will. The decedent did not receive independent advice from an attorney. There was some secrecy in the will's preparation, in that the decedent told Holmes and Longoria in 2016 not to tell anyone that she was considering changing her will. The disposition of property is very different from that in the 2015 will. And a reasonable person could regard the disposition of property as unnatural, unjust, or unfair.

There are other circumstances, however, that point toward the decedent exercising her free will in changing her estate plans. It was the decedent who decided not to hire an attorney as she was unhappy with the 2015 will process, including its cost. The decedent directed Longoria to prepare multiple drafts of the new will, evincing both her attention to its contents and a lack of haste. The decedent herself was not secretive about changing the will, in that she shared her plans with neighbors and really only hid it from Hood. The decedent's relationship with Hood changed two to three years before she executed the new will, but we

---

[5] It is important to remember that, even if a confidential relationship existed *and* the circumstances surrounding the will were suspicious by reference to the *Reddaway* factors, the proponent of the will can still disprove undue influence. *Williamson*, 326 Or App at 651. The will proponent cannot be worse off for the absence of a confidential relationship. As such, when no presumption of undue influence arises, and the burden remains on the will challenger, we may consider suspicious circumstances by reference to the *Reddaway* factors, but we must also consider all the other evidence to decide whether, given all of the facts, we are persuaded that the will is the product of undue influence.

are not convinced that it was *because of* her relationships with Holmes and Longoria. The stronger evidence is that the decedent and Hood had a falling out in 2014, around the time of Carl's passing, which was exacerbated in 2015 by the decedent's perception that Hood sided with Holmes's ex-wife in the divorce.

The decedent's attitude toward Hood in the final years of her life may have been unjustified or unfair, but we find that there was a substantial rift between them during that time. And, although a reasonable person could regard the terms of the 2017 will as unnatural, unjust, or unfair—particularly given how close the decedent had been with Hood prior to 2015—people are allowed to be unfair or unkind in their wills, so long as it is their own decision reflecting their own free will. Finally, the decedent's strong personality and long-standing independence made her less susceptible to undue influence, albeit not necessarily impervious to it.[6] *Compare Larson v. Naslund*, 73 Or App 699, 702, 700 P2d 276 (1985) ("[A]lthough [the decedent] depended on [her son] for assistance in caring for her property and in some financial matters, she was not an enfeebled elderly woman who relied on her son for everything. She led an independent and active life insofar as her health allowed, and there is no evidence to show that [her son] controlled her thoughts or actions."), *with McNeely v. Hiatt*, 138 Or App 434, 442, 909 P2d 191, *adh'd to on recons*, 142 Or App 522, 920 P2d 1150, *rev den*, 324 Or 394 (1996) (recognizing that someone appearing "fit and active" does not make them immune to undue influence).

In the end, we agree with the trial court that the decedent "did exactly what she wanted to do," that the 2017 will reflects the decedent's own decision to disinherit Hood and her children as punishment for their perceived shortcomings (fair or not), and that the decedent was not unduly influenced by Holmes or Longoria in executing the 2017 will.

---

[6] To the extent that Asbridge contends that the decedent had some dementia near the end of her life, we are unpersuaded that her mental condition in early 2017 made her more susceptible to undue influence. The decedent had testamentary capacity in May 2017 (an issue that is no longer disputed), and the evidence cited by Asbridge is too vague to show an increased susceptibility to undue influence in the relevant time period.

That brings us to Asbridge's third assignment of error, in which he contends that the decedent's designation of Holmes and Longoria as POD beneficiaries on her bank account, which contained approximately $360,000 at the time of her death, was the result of undue influence, such that those funds should be returned to the estate. Asbridge's arguments on that issue are largely the same as those regarding the 2017 will, and we reject them for largely the same reasons. Also, we do not view the POD beneficiary decision as being as inconsistent with the 2017 will, or as illogical, as Asbridge does. And we are swayed by the fact that the only evidence is that it was a bank employee, not Holmes or Longoria, who suggested the POD designation to the decedent, *see Robinson v. Leonard*, 274 Or 635, 640-41, 547 P2d 629 (1976) (considering the lack of evidence that the alleged undue influencers "initiated the idea of transferring an interest in the property to them" in assessing undue influence), as well as by the fact that the decedent rejected the alternative option of adding someone to her account, due to wanting to control her own account during her lifetime. We are ultimately unpersuaded that the POD designation was the product of undue influence by Holmes or Longoria, rather than a choice freely made by the decedent for her own reasons.

Finally, Asbridge's fourth assignment of error relates to his conversion claim, which is based on Holmes having removed estate property—furniture, jewelry, a safe containing cash, and a safe containing firearms—from the decedent's house after her death. There are some potential procedural issues relating to that claim but, in any event, Holmes testified as to which items he took and that those he took were *inter vivos* gifts from the decedent, and we find that testimony credible given the totality of the evidence.

For those reasons, on *de novo* review, we affirm the limited judgment of the trial court dismissing Asbridge's claims.

Affirmed.