DEHOOG, J.
*248 Mother appeals a juvenile court judgment terminating her parental rights to her four-year-old daughter.[1] Over mother's opposition, the juvenile court terminated her parental rights on grounds of unfitness, ORS 419B.504, and neglect, ORS 419B.506. On appeal, mother raises three assignments of error. In particular, mother asserts that the juvenile court erred in determining that she is unfit to parent child and that she had neglected child. As a result, mother contends, the court erred in terminating her parental rights.[2] As we explain below, we conclude, on de novo review,[3] that the juvenile court erred in terminating mother's parental rights; accordingly, we reverse and remand.
The juvenile court took jurisdiction over child in 2016, when she was two years old. The Department of Human Services (DHS) had removed child from mother's care after police stopped a car driven by father and found methamphetamine and syringes inside. Mother and child were passengers in the car. At that time, child was dirty, behind on her vaccinations, and needed dental care. Mother and father both displayed physical signs associated with methamphetamine use, which included a dirty appearance, tooth decay, and "pick" marks on their faces. DHS placed child in relative foster care with father's adult son, child's half-brother. Child has since remained in that placement, where she has done well. She is bonded with her caregivers and has no special needs or concerning behavioral or health problems.
*249 Before removing child in this case, DHS was involved with mother in relation to her now-adult children. Specifically, in 2010, as a result of mother's use of methamphetamine, her children were removed and placed in substitute care with family members. Those children returned to live with mother upon reaching adulthood; two of the older children currently live with mother and she has frequent contact with the third.
After child was removed from her care, mother sought out and engaged in substance abuse treatment through the Karuk Tribe. Mother has also undergone urine testing in connection with her treatment and employment at various times over the life of the case; none of those tests have been positive for the use of methamphetamine or other illegal drugs. However, two "hair follicle" tests conducted in the months leading up to the termination trial detected low levels of methamphetamine. Also, despite mother's assertion that she very rarely drank, two of her urine samples tested positive for alcohol use, leading DHS to suspect that she drank more than she claimed.
*729 In addition to obtaining substance abuse treatment, mother has also attended numerous parenting classes, and her family members have attended classes to help them recognize the signs of relapse in people addicted to drugs. Mother's adult daughter testified that she had seen "remarkable changes" in her mother over the past couple of years. Mother no longer exhibits the moods and behaviors that she did during her time of habitual drug use. We could credit the testimony that she seems happier, is more involved with the family, and looks healthier.
Throughout child's placement in substitute care, mother has participated in weekly telephone visits. Mother has also attended weekly, in-person visits with child, each time driving hundreds of miles to Oregon from California, where mother has been living with her parents. Indeed, since 2016, mother has cumulatively driven many thousands of miles to attend her weekly visits with child. Mother has interacted appropriately with child during her visits, playing and laughing with child and otherwise remaining actively engaged.
*250 Approximately six months before the termination trial, mother obtained full-time employment, and she remains employed in a supervisory position in a casino. As part of her responsibilities, mother handles large sums of money. Her position requires that mother be licensed by the State of California, and her employer subjects her to random drug testing.
At the time of trial, mother continued to live in her parents' home, together with her parents and two of her adult children. After a home study conducted in the course of these dependency proceedings, that home was approved as a placement for child, provided that mother not live there.[4] In other words, the home itself was determined to be safe and appropriate for child.[5] Mother intended to continue living with her parents in that home.
As noted, although mother's urine tests were negative for methamphetamine and she denies having used methamphetamine at any time during child's placement in substitute care, two "hair follicle" tests conducted approximately three to four months and a week or two before trial indicated the presence of that drug. A "positive" result for methamphetamine indicates the detection of at least 500 picograms per milligram of tested hair.[6] In this case, one test detected just over that minimum confirmation level, showing 532 picograms of methamphetamine per milligram. The other, earlier test detected somewhat more, or 827 picograms per milligram. Both numbers, however, reflect very low levels of methamphetamine, according to DHS's expert witness.
Dr. Robert Basham, a psychologist, evaluated mother approximately a year and a half before the termination trial.[7]
*251 In his evaluation, Basham stated that, if mother continued to stay with her family in California (and remained separated from father), he would have no significant concerns with respect to her readiness to care for child. He did observe that mother was defensive and would likely not be receptive to mental health treatment, but he also observed that mother did not have any identified mental health problems for which a referral to treatment would be warranted. At trial, however, Basham expressed concern about mother's prognosis to parent child in light of the hair test results, because, he explained, methamphetamine use is very disruptive.
*730 DHS's petition to terminate mother's parental rights alleged as follows:
"The parental rights of the mother to the above-named child should be terminated under ORS 419B.504 on the grounds that mother is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the mother's home is improbable within a reasonable time due to conduct or conditions not likely to change, including, but not limited to the following:
"(a) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.
"(b) Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the parent is possible.
"(c) Failure to present a viable plan for the return of the child to parent's care and custody.
"(d) Failure to learn or assume parenting and/or housekeeping skills sufficient to provide a safe and stable home for the raising of the child.
"(e) Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible.
*252 "(f) Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such [an] extended duration of time that it appears reasonable that no lasting adjustment can be effected."
DHS also alleged that mother's rights should be terminated under ORS 419B.506 :
"The parental rights of the mother to the child should be terminated under ORS 419B.506 on the grounds she has failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of the petition, as shown by, but not limited to, the following:
"(a) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance while custody was lodged with others.
"(b) Failure to maintain regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent."
At the close of evidence at the termination trial, DHS moved to dismiss its allegation that mother had failed to maintain regular visitation or other contact with child. The juvenile court found that DHS had demonstrated unfitness and neglect on all of the remaining allegations, however, and the court entered a judgment terminating mother's parental rights pursuant to ORS 419B.504 and ORS 419B.506. Mother appeals that judgment.
In reviewing de novo the juvenile court's judgment terminating mother's parental rights, we determine anew whether mother's parental rights should be terminated. DHS must prove the grounds for termination by clear and convincing evidence, ORS 419B.521(1) ; that is, the evidence must make the existence of the facts in question highly probable. State ex rel. Dept. of Human Services v. Smith , 338 Or. 58, 79, 106 P.3d 627 (2005).
On appeal, with respect to the termination of her parental rights on grounds of unfitness under ORS 419B.504, mother urges us to conclude that the record does not contain clear and convincing evidence that her conduct or condition was seriously detrimental to child. DHS, while *253 acknowledging that mother has made some improvement, asserts that the evidence demonstrates that she has not made "sufficient progress in addressing her substance abuse and parenting issues" and that we should, therefore, conclude that she is unfit.
As the Supreme Court explained in State ex rel. SOSCF v. Stillman , 333 Or. 135, 145-46, 36 P.3d 490 (2001) :
" ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court *731 must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second-and only if the parent has met the foregoing criteria-the court also must find that the 'integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.' That second part of the test for termination requires the court to evaluate the relative probability that, given particular conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.' "
In considering whether a parent's conduct or condition is "seriously detrimental," we focus on the effect of the condition on the child, not on the "seriousness of the parent's conduct or condition in the abstract." Id. at 146, 36 P.3d 490. "That said, a condition or conduct can be 'seriously detrimental' based on the potential for such harm." Dept. of Human Services v. B. J. J. , 282 Or. App. 488, 502, 387 P.3d 450 (2016). Our inquiry is child specific. Furthermore, to demonstrate that a parent is unfit, DHS "must prove more than unfitness at some point in the past, but rather must prove that the conduct or condition is seriously detrimental at the time of the termination hearing. " State ex rel. Dept. of Human Services v. A. M. P. , 212 Or. App. 94, 104, 157 P.3d 283 (2007) (emphasis in original). "[P]ast unfitness is insufficient." Dept. of Human Services v. R. K. , 271 Or. App. 83, 89, 351 P.3d 68, rev. den. , 357 Or. 640, 360 P.3d 523 (2015). Thus, DHS must prove that mother's conduct and *254 conditions at the time of the hearing are seriously detrimental to child. See Dept. of Human Services v. A. M. C. , 245 Or. App. 81, 89, 260 P.3d 821 (2011) ("Unspecified detriment that we can discern only because the evidence of conduct or condition 'speaks for itself,' is a far cry from actual, clear, and convincing evidence that proves serious detriment."). Here, DHS has not persuaded us that mother is unfit under those standards.
DHS's case is based primarily on the evidence regarding mother's use of methamphetamine. In support of its contention that mother was unfit at the time of the termination trial, DHS emphasizes mother's past abuse of methamphetamine, together with the two positive hair tests, the psychological evidence of her defensiveness, and the negative effect that her recent use of methamphetamine would have on her prognosis. In DHS's view, mother's continued denial that she used methamphetamine during the pendency of the case, even when confronted with the results of the hair testing, demonstrates that mother has not addressed her drug problem and that her defensiveness has prevented and will continue to prevent her from doing so. However, in light of all of the evidence regarding mother's conduct and conditions at the time of trial, we are not convinced that she was unfit at that time.
Although mother has admittedly had serious problems with methamphetamine use in the past, the evidence was that, by the time of trial, she had made a marked transformation. She and two of her adult children were living with her parents in their home, which had been determined to be a safe and appropriate place for child and was the place that mother intended to continue living. The evidence also showed that mother's family was committed to ensuring child's safety, having gone so far as to take classes to help them recognize the signs of a drug relapse should mother suffer one.
To date, mother has not outwardly manifested signs of a relapse. Mother's ongoing engagement in drug treatment and related urine testing over the course of child's out-of-home placement do not suggest a return to habitual drug use. Furthermore, mother's family expressed that her mood, *255 conduct, and appearance had all measurably improved. At the time of trial, mother was happier, she was involved in activities with her family, and her appearance was healthier than it had been during mother's period of active methamphetamine abuse.
Mother was also gainfully employed at the time of trial. Indeed, her position was one of responsibility; mother supervised others and, in the course of the job, handled large sums of money. As noted, mother was subject to random drug testing as part of that job and her continued employment in that position beginning six months before trial strongly *732 indicates that mother was doing well in that respect.
Mother's significant efforts to maintain her connection with child over the course of this case also inform our view of the relevant circumstances. Mother had regular telephone contact with child and drove hundreds of miles weekly to visit with child in person. The evidence regarding that visitation uniformly showed that mother actively played with and otherwise acted appropriately toward child. In addition to that evidence of mother's commitment to child, she also took and completed numerous parenting classes while child was in substitute care.
We acknowledge DHS's concern regarding the two hair tests conducted in the months before trial, which showed the presence of low levels of methamphetamine. However, there is no evidence in the record of any behavior of mother at or around the time of trial suggesting drug impairment. Indeed, other than those exceedingly low test results, there is no evidence whatsoever that mother in fact used methamphetamine, much less that any such methamphetamine use has had any effect on mother's conduct or life. Thus, although we are mindful of the psychologist's concern regarding mother's apparently minimal recent usage on her prognosis, especially in light of mother's past drug abuse and her defensiveness and resistance to treatment, that evidence, in light of all of the other evidence-including the evidence of mother's changed demeanor, her employment, her significant efforts to engage in treatment and improve her parenting, her devotion to maintaining her connection with child, and her extensive efforts to do so-does not *256 convince us that mother's conduct or condition was seriously detrimental to child at the time of trial. In other words, in the absence of evidence that mother's seemingly incidental use of methamphetamine has negatively affected mother's employment, relationships, or other parts of her life in any way, that evidence, even in light of the psychologist's concerns and considering mother's past drug abuse, does not persuade us that mother is unfit. Cf. Dept. of Human Services v. J. J. B. , 291 Or. App. 226, 418 P.3d 56 (2018) (juvenile court erred in asserting jurisdiction over a child based on substance abuse, despite evidence that parents had "relapsed" and had been using methamphetamine for several months). Instead, we agree with mother that the evidence in this case "provides a clear story of Mother's upward trajectory from a serious drug problem [in the past] to her successful efforts to live a functional life at the time of the hearing."
In sum, DHS has failed to convince us, by clear and convincing evidence, that mother's conduct or condition at the time of the termination trial in this case was seriously detrimental to child. Accordingly, we conclude that the trial court erred in terminating mother's parental rights based on unfitness.
Mother separately challenges the juvenile court's determination that her parental rights should be terminated because of neglect under ORS 419B.506. Pursuant to that statute, the rights of a parent may be terminated
"if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child or ward for six months prior to the filing of a petition. In determining such failure or neglect, the court shall disregard any incidental or minimal expressions of concern or support and shall consider but is not limited to one or more of the following:
"(1) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others.
"(2) Failure to maintain regular visitation or other contact with the child or ward that was designed and implemented in a plan to reunite the child or ward with the parent.
*257 "(3) Failure to contact or communicate with the child or ward or with the custodian of the child or ward. In making this determination, the court may disregard any incidental visitations, communications or contributions."
Here, mother's rights were terminated for neglect on the ground that she had, without reasonable and lawful cause, failed to provide care or pay a reasonable portion of substitute physical care and maintenance while custody of child was lodged with others. To sustain the juvenile court's termination of mother's *733 parental rights on the ground of neglect, we must be persuaded by clear and convincing evidence, that mother, without reasonable and lawful cause, failed to provide care for child or pay a reasonable portion of her care. Here, there is no evidence that persuades us that mother's parental rights may be terminated on that ground. In particular, although there was evidence that mother was employed full-time during the six months before the termination trial, there was no evidence regarding whether she had or had not paid any costs of child's substitute care, nor was there any evidence that mother had ever been ordered or instructed to do so. See Dept. of Human Services v. A. L. M./J. T. C. , 242 Or. App. 625, 633 n. 3, 259 P.3d 17, rev. den. , 350 Or. 716, 260 P.3d 493 (2011) (concluding that the record did not support termination for neglect under ORS 419B.506 where, among other things, there was no evidence that, "during the six months before filing of the termination petition, [parent] was ordered to pay any costs of [child's] substitute care or had any income with which to do so"). In the absence of any such evidence, DHS has not proved by clear and convincing evidence that mother "has failed or neglected without reasonable and lawful cause to provide for the" needs of child under ORS 419B.506.
Reversed and remanded.

Father's parental rights were terminated by default and father is not a party to this appeal.

In her first assignment of error, mother asserts that the juvenile court erred in excluding certain evidence as hearsay. Our resolution of mother's other assignments obviates the need to address that contention.

As we have explained, to the "extent that a credibility determination is based on a comparison of the witness' testimony with the substance of other evidence, this court is as well equipped as the trial court to make that credibility determination." State ex rel. Juv. Dept. v. G. P. , 131 Or. App. 313, 319, 884 P.2d 885 (1994). Accordingly, on de novo review, we defer to the juvenile court's demeanor-based credibility findings, but not to credibility findings that appear to have been driven by a comparison of the testimony with the substance of other evidence. See Dept. of Human Services v. T. M. M. , 248 Or. App. 352, 356 n. 1, 273 P.3d 322, rev. den. , 352 Or. 170, 285 P.3d 720 (2012).

The home had not been approved as a placement with mother living in the home because of the urine tests indicating mother's alcohol use.

The home study was conducted as part of a request that child be placed with mother's parents in California. DHS did not move child from her initial placement with her half-brother and his wife, and the approval ultimately expired after six months passed.

A picogram is one trillionth of a gram.

DHS also introduced evidence of a psychological evaluation that had been conducted during the earlier case involving mother's older children, approximately seven years before the termination trial in this case. It also introduced testimony from the psychologist who conducted that examination, although that psychologist had not evaluated or treated mother since that time. We do not consider that evidence persuasive, especially given the number of years that have passed since the evaluation was conducted.