No. 314       May 15, 2024       565

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of S. N. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. C. C.,
*Appellant.*

Lane County Circuit Court
20JU05646; A178108

Erin A. Fennerty, Judge.

Submitted September 15, 2022.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Sarah Peterson, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General, filed the brief for respondent.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Father appeals a judgment in which the juvenile court terminated his parental rights to his daughter. At trial, father did not contest that his lengthy incarceration, which has made him unavailable as a custodial resource for child since her birth in November 2017 and which will likely continue until 2025, renders him unfit to parent child under ORS 419B.504. However, he challenges the adequacy of the demonstration by the Department of Human Services (the department), required to be by clear and convincing evidence, that terminating his parental rights serves child's best interest. He argues, as he did below, that a permanent guardianship would better serve child's best interest, allowing her to maintain stability in her current custodial placement with her resource parents while preserving her legal connection to father. On *de novo* review and after careful consideration of this record, we conclude that termination of father's parental rights serves child's best interest under these specific circumstances, though our analysis differs from that of the juvenile court. Accordingly, we affirm.

We review the evidence in termination of parental rights proceedings *de novo* to determine the ultimate facts, ORS 19.415(3)(a), "giving considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony." *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990); *accord Dept. of Human Services v. T. L. M. H.*, 294 Or App 749, 750 n 1, 432 P3d 1186 (2018), *rev den*, 365 Or 556 (2019) ("We ordinarily defer to the juvenile court's credibility findings when those findings are based on the court's direct observation of the witnesses * * * because we, as an appellate court, do not have the same opportunity to observe witnesses firsthand and, for that reason, [we] do not have the same institutional capacity to make demeanor-based judgments."). We then "determine anew" whether to terminate parental rights. *Dept. of Human Services v. H. R. E.*, 297 Or App 247, 252, 441 P3d 726 (2019).

We proceed to recount the facts necessary to explain our decision. At the time of child's birth in 2017, father was

in custody, facing a federal robbery charge for which he was eventually convicted and sentenced to a term of incarceration until 2025. The department became involved with mother due to concerns about her substance use and ultimately removed child from mother's care in March 2018, when she was four months old. Child's first placement with her maternal aunt lasted two months and child was then placed in nonrelative foster care with her current resource family, the Christiansons, in May, around a month after the juvenile court asserted dependency jurisdiction.[1]

During much of the life of this case, father, who is Black, has expressed a strong wish that child be placed with his relatives rather than keeping her in her nonrelative placement with the Christiansons, who are white. Unfortunately, an early attempt to remove child from her placement with the Christiansons and place her with father's relatives did not go well; child spent about three and one-half months in the care of father's relatives, but they ultimately sought to have her removed around three months later, citing that they were overwhelmed caring for child due to her high needs and their other responsibilities. On child's return to the Christiansons, they noticed concerning physical changes in child and sought medical treatment. Medical professionals ultimately concluded that child had suffered a subdural hematoma ("bleeding around the brain likely due to trauma"). With the aid of intensive outpatient therapies, child recovered from the immediate effects of the brain injury but remains medically fragile and requires ongoing care and therapeutic interventions.

Father continued to express concerns about child being raised by nonrelatives in a white family and, very early on, expressed a desire to relocate child to Georgia to live with his sister. For a variety of reasons, the department did not pursue that option for some time and, once it did, sister ultimately did not follow through with some communications necessary to consider it fully. Other than the brief period with father's relatives, child has been living with the Christiansons since May 2018 in what is, by all accounts, a

---

[1] Mother's parental rights were previously terminated, and she is not a party to this appeal.

very secure placement. She is attached to them and to the other children in their household, all of whom came to them as foster children and some of whom they have adopted. The Christiansons have indicated that they wish to adopt child.

During the life of the case, father has put persistent effort into building a relationship with child, which has been difficult due to her young age and his carceral status. However, his communications with the foster mother, Mrs. Christianson, were sometimes angry and hostile, though he would sometimes apologize later for things he said. The content of his communications frequently included resistance to child's attachment to the Christiansons and assertions of the importance of his role as her biological parent. Mrs. Christianson frequently found those interactions challenging; nevertheless, she has worked hard to support father's efforts to build a relationship with child. Given the limitations of father's carceral status, including restrictions on visitation and lockdowns due to the COVID-19 pandemic and other issues, almost all of his visits with child have been by telephone. Child knows who father is but, not surprisingly given her age, other attachments, and the limitations of her contact with him, she does not display much of an attachment to father and sometimes resists the phone calls.

A challenge for father in pursuing a permanent guardianship is that he has persistently expressed an intention to take custody of child upon his release from prison, despite the length of time that she has spent with the Christiansons and the security of her attachment to them. He expressed an interest in a permanent guardianship for the first time at the termination trial, and his testimony early in that proceeding suggested a continuing belief that he might assume custody of child upon his release, though his later testimony backed off from that view. The juvenile court specifically indicated that it did not find father's testimony credible, a finding to which we defer.

ORS 419B.500 requires a determination, from the evidence presented in the termination proceeding, whether termination is in the child's best interest. *See Dept. of Human Services v. D. M. P.*, 317 Or App 529, 530, 504 P3d 1221 (2022) (stating that the "determination of whether termination of

parental rights is in a child's best interests requires more than an assessment of the relative merits of their potential adoptive placement and returning them to live with their parents"). The department must prove its case for termination by clear and convincing evidence. ORS 419B.521(1). To be clear and convincing, the evidence must make "the existence of a fact 'highly probable'" or be of "'extraordinary persuasiveness.'" *State ex rel Dept. of Human Services v. A. M. P.*, 212 Or App 94, 104, 157 P3d 283 (2007) (quoting *State ex rel Dept. of Human Services v. Hinds*, 191 Or App 78, 84, 81 P3d 99 (2003)).

In concluding that child's best interests require termination of father's parental rights, the juvenile court found that child "does not have an interest in maintaining a relationship with [f]ather and her larger paternal family," noting a lack of evidence that "such relationships exist in a meaningful sense." The court implied that father is to blame for the "almost disastrous consequences" of child's placement with father's relatives and noted that the practical difficulties that he has faced in building a relationship with child during a period of incarceration are "a direct result of his own knowing and volitional criminal conduct." Although the court acknowledged "the importance of recognizing and honoring the identity factors in children of color," it found "little substantive evidence that this is a substantial need that [child] needs fulfilled by [f]ather, especially in light of the foundation that her resource parents laid in order to make sure [child] is connected to the full spectrum of her background and heritage," including her Filipina and Chinese heritage on her mother's side. According to the court, the Christiansons have fulfilled child's need for connections with her heritage by maintaining connection with members of mother's family, engaging in community programs aimed to support Black children, and forming relationships with other families with children of color.

On *de novo* review, this court takes a different view, and is not inclined to minimize the potential role of a biological parent in passing along important aspects of cultural identity, nor to minimize the concerns about a Black parent regarding his child being raised in a white family. This

record does not support a conclusion that child does not have an interest in maintaining a relationship with father or any of her paternal relatives, nor that father had any reason to know that she would experience harm in the care of his relatives, nor that none of child's paternal relatives has anything to offer her. This record likewise does not support the view that whatever choices father made that resulted in his incarceration provide a reason to conclude that he has nothing to offer child as the one biological father she will ever have. The actions of Mrs. Christianson to support whatever relationship with father is possible during his incarceration reflects an appropriate estimation of child's best interests, and the Christiansons' efforts to connect child to her heritage in other ways available to them do not replace what biological family members may be capable of offering. This record does not support a contrary view.

Nevertheless, the record does support a concern regarding father's capacity to support a permanent guardianship. Though father's testimony early in the termination trial regarding the role he might play in the context of a guardianship may reflect more ignorance than bad intent, this court is not inclined to reject the juvenile court's finding that his expressions of respect for the importance of child's relationship with the Christiansons were not credible. Given father's past attempts to disrupt child's relationship with them and to minimize the importance of that attachment, there is reason for concern that father would foment conflicts that would not be in child's best interest. Father has not persuaded us that a permanent guardianship is in child's best interest under these circumstances, given that history.

We emphasize that our conclusion that termination of the legal relationship between father and child is in child's best interest does not include a conclusion that child has no interest in maintaining whatever relationship is possible with father and her paternal relatives in a way that protects her primary attachments. This record includes significant evidence that the Christiansons understand the importance of that concern, including the efforts they have made to build and maintain child's relationships with her

maternal relatives and also with father and to do the same for their other children. This court's role is to ascertain what is in child's best interest, not to delegate that task to potential adoptive parents. While we conclude that, on this record, termination of father's legal relationship with child is the best means of protecting child's need for permanency, we do so mindful that preserving whatever relationship with father is possible is also in her best interest and, given the evidence, is likely achievable under these circumstances despite termination of father's parental rights.

Affirmed.