334 June 26, 2024 No. 417

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of E. L. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. M.-A.,
*Appellant.*

Washington County Circuit Court
23JU00751; A182324

Oscar Garcia, Judge.

Submitted March 18, 2024.

Aron Perez-Selsky and Michael J. Wallace filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Emily N. Snook, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

ORTEGA, P. J.

Reversed and remanded.

**ORTEGA, P. J.**

Father appeals from a judgment terminating his parental rights to his two-year-old daughter based on unfitness, ORS 419B.504, and neglect, ORS 419B.506.[1] On appeal, father does not contest those bases for termination; he assigns error only to the juvenile court's determination that termination of his parental rights is in child's best interest as required by ORS 419B.500. Father argues that a permanent guardianship would satisfy child's need for permanency and that the evidence was not sufficient to support the court's determination that termination was in child's best interest given that no adoptive resource was identified at the time of trial. The Department of Human Services (the department) contends that because father did not pursue a permanent guardianship at trial, his argument in favor of a permanent guardianship is unpreserved. The department further maintains that termination and adoption are in child's best interest. We agree that father did not clearly express an interest in a permanent guardianship at trial but ultimately conclude on *de novo* review that the department did not meet its burden to show by clear and convincing evidence that terminating father's parental rights serves child's best interest. Accordingly, we reverse and remand.

We begin with preservation in order to establish what is properly before us. To preserve an issue claimed as error, a party must have raised the issue in the original proceeding. *State v. K. J. B.*, 362 Or 777, 790, 416 P3d 291 (2018). At trial, father argued in his opening statement that "he is in a position to have custody," adding that "[g]uardianship of [child] would still be a viable and appropriate possibility if you do not terminate [f]ather's parental rights." He maintained during his testimony that he wanted child to "return" to him. Father's assertion that he expected to have custody of child and his reference to a "guardianship" do not clearly raise the issue of a permanent guardianship, given that a parent may not move to terminate a permanent

---

[1] Prior to the termination trial, the juvenile court issued a judgment terminating mother's parental rights to child and to child's sibling; in a separate proceeding, the juvenile court also terminated mother's parental rights to her other two children, child's half-siblings. Mother is not a party in this appeal.

guardianship and resume a custodial role.[2] Nevertheless, as the department acknowledges, father preserved his challenge to whether termination of his parental rights serves child's best interests, and given our disposition, the various options for achieving permanency for child will remain for the court to consider on remand.

We turn to whether there is clear and convincing evidence to support a determination that termination serves child's best interest. We review the record in proceedings for termination of parental rights *de novo*, ORS 19.415(3)(a), and determine anew whether to terminate parental rights. *Dept. of Human Services v. H. R. E.*, 297 Or App 247, 252, 441 P3d 726 (2019). We conclude that the evidence in the record is insufficient to support such a determination.

We proceed to recount the facts necessary to explain our decision. Child was born premature in September 2021 with an array of medical conditions that have led to several uncommon diagnoses. Those diagnoses include a genetic mutation known as KAT6B (which causes child to have seizures and epilepsy), a urinary condition known as hydronephrosis that leads to recurrent urinary tract infection, a muscle condition known as hypotonia, which causes motor delays and speech disorders, and a neurological malformation in the brain that causes additional health issues. Because of those conditions, child is medically vulnerable and experiences frequent hospitalizations, and her needs are extremely high. Additionally, child is nonverbal, has problems with her eyesight and hearing, and is fed entirely by feeding tube, all of which contributes to the challenges of meeting her needs.

After child's birth, she remained in the hospital neonatal intensive care unit (NICU) for about seven weeks. Before she was discharged, the department removed child from parents, alleging in part that parents had a pattern of substance abuse and that father had subjected mother

---

[2] A guardianship, ORS 419B.366, known as a "general guardianship," differs from a "permanent guardianship" as set forth in ORS 419B.365. *Dept. of Human Services v. A. D. J.*, 300 Or App 427, 435-36, 453 P3d 619 (2019). While the first provides the parent with the right to "move to vacate" the guardianship and recover custody of the child, ORS 419B.368(1), the second "deprives the parent of the ability to move to terminate it," ORS 419B.368(7). *Id*. at 436.

to domestic violence and failed to understand child's complex medical needs. The department also had concerns that parents did not consistently visit child in the NICU. The juvenile court issued a shelter order placing child in nonrelative substitute care, and ultimately exercised dependency jurisdiction and made child its ward. Child had been in two substitute placements by the time of the termination trial and has never lived with parents.

At the termination trial nearly two years after child's birth, the department introduced, among other evidence, copies of its reports regarding child's case and of its communications with father and other involved individuals. Child's pediatric urologist, Bayne, and her pediatrician, Cross-Knorr, agreed that child's health conditions will affect her throughout her life. Bayne, who has performed at least six surgeries on child, opined that she will likely suffer "significant debilitating" effects from her conditions. Cross-Knorr opined that the life expectancy of a person with such conditions is "shorter than average."

There is no dispute that child requires an exceptional level of care, that father has not consistently visited her and has not developed the skills to attend to her complex needs, and that caring for child requires special training. Trinity, child's first resource parent, who cared for child for about a year, testified that caring for child full-time was "grueling," given child's medical conditions and Trinity's other employment and childcare obligations. Kerri, child's second resource parent, who is a registered nurse with 20 years of experience caring for medically fragile children and who had been caring for child for about eight months at the time of trial, testified that "it's not feasible to [care for child] alone long-term" and that she relied on help from other caregivers. Kerri further testified that she is not in a position to adopt child, should the court terminate father's rights, but is available to work with a new caregiver when the time comes.

The department had not identified an adoptive family for child at the time of trial but maintained that she is adoptable. Durfee, the caseworker assigned to child's case, testified that there were "prospects," but none had been

selected. The department maintained that it was in child's best interest to be freed for adoption by a family that can provide child with "the love, structure, and permanency that she needs and deserves." It argued that father, who had not consistently visited child or acquired skills to understand her medical needs, was not capable of doing that. As it did below, the department argues that father declined visitation and refused to attend child's medical appointments.

The juvenile court accepted the department's view of father's efforts, finding that father had not stayed in consistent contact with child and that child has "not developed an irretrievable bond with father and is likely to develop a bond with others." The court restated the department's assertion that "[f]ather's actions, or lack thereof, speak much louder than his proposed plans and words to parent [c]hild."[3]

Parental rights may be terminated only if the court finds that termination is in the child's best interests. ORS 419B.500. A determination of whether termination of parental rights is in a child's best interests "must be child-centered." *Dept. of Human Services v. T. M. D.*, 365 Or 143, 166, 442 P3d 1100 (2019). The department must prove its termination case by clear and convincing evidence, ORS 419B.521(1), which is evidence that makes "the existence of a fact highly probable" or "extraordinar[il]y persuasive[ ]." *State ex rel Dept. of Human Services v. A. M. P.*, 212 Or App 94, 104, 157 P3d 283 (2007) (internal quotation marks omitted).

On *de novo* review, we begin by noting that we are not persuaded that the record establishes that father declined visitation and refused to attend child's medical appointments, or that his actions convey a lack of interest in or concern for child's welfare. Rather, the record does not establish that the department actually facilitated visits in

---

[3] Asked at trial about his plan for child and her sibling, father asserted an intention "to get them back as soon as *** possible." He added, "I've lost a lot of time with them. I just plan to *** give them everything I have. Dedicate my entire life to them, *** provide, and *** be a father." He stated that his "mother and three sisters" would help him with the two children. Child's sibling was placed in a permanent guardianship, a decision that is not before us in this appeal.

a way that was workable for father, who was working regularly and who also completed services to address substance use and domestic violence. Four action agreements between the department and father indicate that father should visit child at "[the department] office, or another approved location," and that the start and end dates of those visits were to be determined. While the department regularly updated father about child's health status, its messages regularly indicated that visits were not possible at the given times for a variety of reasons, such as restrictions associated with the COVID-19 pandemic and child's fragile health. The evidence indicates that scheduling visits was often challenging.

Moreover, the department's offers of visit times were set during child's hospitalizations or medical appointments, and were often scheduled imminently, on the same day or the next day. Father was notified of invitations to participate in 15 medical appointments, some of which were ultimately cancelled, including in-person, video, and telephone appointments that were set to occur within anywhere from two days later to three months later. Communications came mainly from the department, which served as intermediary between father and the various medical providers and caregivers; the record does not suggest that father had meaningful opportunities to coordinate directly with providers, making scheduling more cumbersome. The messages do not reflect any attempt to coordinate with or accommodate father's working schedule or other obligations and place the burden entirely on father to appear as directed. Messages inviting father to participate in medical appointments noted, for example, that "the agency will NOT be providing reminder calls or emails for these appointments, nor will the clinics." Regarding phone appointments, the department instructed that the caller "will only attempt calling once." Further, the record does not reflect that the department allowed father to visit child without advance authorization from the department and contains no evidence of how the department facilitated other forms of contact between child and father while child was in resource care, except from testimony (some of it contradicted) that he had the contact information for both resource parents.

The department's communications with father, including its replies to his requests for visitation, often indicated that it was still "looking how to make [visits] occur." The visits that did occur raise no concern about father's interest in child. For example, Kerri testified that when father visited child after the termination petition was filed, he was "really, really loving and sweet," texted afterward asking for pictures, and texted again a few days later asking about child and "wondering" about "being able to come to appointments." Father testified, "If [child] was given to me today, I would sit at the hospital all day until they taught me everything I needed to know to go home again." Overall, on this record, we cannot conclude that father's inconsistency in visiting child can be attributed entirely or predominantly to a lack of interest or concern on his part.

We further are not persuaded that father's lack of a bond with child suggests that termination is in her best interest under these circumstances. Child's current resource parent is not prepared to adopt her, and child is nonverbal and her capacity for bonding is unclear. The department had not identified an adoptive placement at the time of trial, and the reality is that child is facing another change in placement under the best of circumstances. The record does not establish that terminating contact with a biological parent who cares for her, even though he is not equipped to attend to her complex needs, serves her best interests.

The department urges that, absent termination, the court's wardship will "necessarily end[ ]" when child reaches 21 years of age pursuant to ORS 419B.328(2)(e), while child will require lifelong care that father will not be able to provide. *See* ORS 419B.328(2)(e) (a juvenile court's wardship in a dependency case terminates when "[t]he ward becomes 21 years of age"). In the department's view, adoption offers child the only resolution that provides for her best interests in the long term. To the contrary, although adults with disabilities may rely heavily on the goodwill and capacity of parents or caregivers to advocate on their behalf, there is no clear legal requirement that imposes parental obligation to do so when a severely compromised child reaches adulthood. Accordingly, the end of a wardship when child turns 21 does

not establish that adoption is necessary to child's best interests; once child reaches adulthood, she will likely require another form of guardianship, whether she is adopted or not. *See* ORS 125.305(1)(a) (providing that "the court may appoint a guardian as requested if the court determines by clear and convincing evidence that *** the respondent is incapacitated"); ORS 125.005(5) (defining "incapacitated" to include individuals that are impaired as child is).

On this record, we do not find the evidence "highly proba[tive]" or "extraordinar[il]y persuasive[ ]" that severing child's and father's relationship serves child's best interest under these circumstances. *A. M. P.*, 212 Or App at 104. As noted, the record does not clearly establish that father is unable or unwilling to maintain contact with child. Further, child's complex and long-term needs suggest some uncertainty as to a permanent adoptive placement on this record, despite the department's assurances that "prospects" exist for an adoptive placement. Under the totality of child's circumstances, severing her legal relationship with the only certain relationship child has at this point cannot be said to be in her best interests on this record.

Reversed and remanded.